[L. A. No. 19484.   In Bank.   Sept. 16, 1949.]

EDWARD E. SIMMONS, JR., Respondent, v. CALIFORNIA INSTITUTE OF TECHNOLOGY (a Corporation) et al., Appellants.

O'Melveny & Myers, Louis W. Myers, Pierce Works, John Whyte and Lyon & Lyon for Appellants.

Samuel L. Kurland and A. Arnold Klein for Respondent.

EDMONDS, J.—Edward E. Simmons is an inventor who devised a strain sensitive element which is used in the measurement of impacts. He entered into a contract with California Institute of Technology concerning the payment of royalties under any licensing agreement made by him for its use and, subsequently, a contract with Baldwin Locomotive Works for the manufacture of his apparatus. The present action for

declaratory relief was brought to have the first agreement declared rescinded, the second one declared void insofar as it confers benefits upon the Institute, and for damages to the extent of benefits already received by the Institute. The appeal is from a judgment in his favor.

Following attendance at the Institute as a student, Simmons was graduated in 1934 and received his Master's degree in 1936. During the summer and fall of the latter year, he occupied an office in the electrical engineering department on the campus and did work for various persons at the Institute and some others who had no connection with the organization. He was paid for his services upon an hourly basis.

At that time Dr. Donald S. Clark, a member of the faculty of the Institute, was in charge of a commercially sponsored project carried on by it and known as ''Impact Research.'' In the course of developing a method for measuring and determining the force of time relations which occur to metals during impact loading, Simmons, who had a reputation for ingenuity, was consulted and made a suggestion for the use of a strain sensitive element. The evidence shows that Simmons' ideas were used and, under his supervision, an apparatus embodying them was constructed which operated successfully.

A few months later, Simmons became a member of the staff of the Institute, on a part-time basis, for work with Impact Research but, at the time he conceived the idea of his invention and put it to practical use, he was not employed by, nor did he receive any compensation for services rendered to the research project. However, in June, 1938, Simmons was employed by the Institute to work with Impact Research on a fellowship basis and received a reappointment for the following academic year.

In the fall of 1939, Baldwin Locomotive Works became interested in the Simmons invention and its representative had conversations with Simmons and Dr. Clark which culminated in the two agreements which are the basis of the present controversy. By this time, Simmons had become greatly interested in the work of Impact Research and its continuation, and suggested to Dr. Clark that the Baldwin offer would be a good proposition if the income received from royalties could be used to pay for materials and the expense of carrying on further research. Dr. Clark agreed that this would be most desirable.

Simmons and Dr. Clark had many conversations in regard

to the terms and conditions which should be embodied in a contract and the provisions as to the use of the royalties. Dr. Clark told him that all royalties should be paid directly to the Institute but that they would be used for Impact Research. He explained to Simmons that the project could receive money only from the Institute, but that any sums paid by Baldwin would be used for Impact Research.

A memorandum entitled ''Agreement,'' bearing date of February 21, 1940, prepared by counsel for Baldwin and executed only by Simmons, recites ''that as to my inventions involving an electrical strain gauge . . . I will not grant any licenses to make, use or sell apparatus or methods embodying any of said inventions unless such licenses are approved by the California Institute of Technology, . . . any license so granted to be subject to such terms and conditions as may be reasonably required by [it] . . . The royalty on said inventions shall be paid to the . . . Institute . . . unless at my option I shall request in writing . . . at least thirty (30) days prior to the end of any three (3) months' period in which royalty accrues that up to and including forty per cent (40%) of the total royalty paid by a licensee shall be paid to me by the said licensee.'' Dr. Clark signed this document as a witness to the signature of Simmons, and it was received in evidence marked Exhibit ''A.''

A contract executed by Simmons and Baldwin ''as of March 13, 1940'' declares that it is ''subject to approval'' of the Institute. This contract, designated in the record as Exhibit ''B,'' grants to Baldwin, with specified reservations, the exclusive license to make for use, rental and sale the inventions covered by the patent for a royalty of five (5) per cent of the sale price or income from rentals of that portion of apparatus embodying the invention. All royalty ''shall be paid to the Institute, unless Simmons at his option shall request in writing to Baldwin and to the Institute, at least thirty (30) days prior to the end of any three (3) months' period in which royalty accrues that any portion up to and including forty per cent (40%) of said royalty shall be paid to him by Baldwin.'' Following this contract is a statement which reads as follows: ''The granting of the foregoing license is approved by the California Institute of Technology in accordance with an agreement between [it and] Edward E. Simmons, Jr., . . . dated February 21, 1940. CALIFORNIA INSTITUTE OF TECHNOLOGY By: A. C. Balch Pres.'' It appears from the evidence that this approval was given by direction

of the executive council of the Institute, but there was no action by it authorizing or ratifying a similar approval of the memorandum executed by Simmons.

Simmons testified that Dr. Clark had told him "the thing to do is to use the income from this invention of yours for the further development of impact testing and dynamic test procedures, and that . . . would make the continuation of the Impact Research project a possibility." Simmons stated that his reply was: "I told Doctor Clark I was very much interested in having the Impact Research project continue, and I would be glad to have the income from this patent go to the Impact Research fund for further use in the development of equipment and tests in the laboratory." Dr. Clark assured Simmons that the royalties, although paid to the Institute would be used solely for the maintenance of Impact Research, and it appears from the evidence that this promise of continuing development of the project, made by Dr. Clark to the young scientist, was the major inducing force behind the agreements here in controversy.

Not until April or May of 1941 did Simmons know that Baldwin's royalty payments were not being, and never had been, used in Impact Research. Simmons then called Dr. Clark's attention to his promises on the subject. Shortly thereafter, Simmons was informed by Dr. Clark that his fellowship would not be renewed after July, 1941, because the project's funds were running low. When Simmons pointed out that the sums being paid by Baldwin were more than the amount of his salary, Dr. Clark replied that the Institute, and not Impact Research, was receiving these royalties and he could do nothing about it. Moreover, said Dr. Clark, there was no need for any further discussion of the subject.

Although the project continued for some time after his discharge, Simmons was not again employed by it although subsequently, upon Dr. Clark's recommendation, he did some work in connection with research being done by the Institute for the government. In January, 1942, Simmons served notice of rescission upon the Institute and this action followed.

From this and other evidence, the trial court determined that Simmons is entitled to the amount of the royalties received by the Institute, and it decreed that the Institute has no right to any royalties accrued, or to accrue. This conclusion is based upon findings that Simmons received no consideration for the execution of the document designated Exhibit "A" nor for the licensing agreement (Exhibit "B")

insofar as the latter contract purports to confer rights upon the Institute; that Dr. Clark made fraudulent statements which Simmons believed and relied upon and that Dr. Clark's acts and representations were neither authorized nor ratified by the Institute.

As justifying a reversal of the judgment, the Institute and Dr. Clark contend that there is insufficient evidence to support the findings as to lack of consideration for the benefits conferred upon the Institute, or the findings that the execution of the writings was induced by fraud. They also assert that no evidence should have been admitted upon the charge of fraud, and that Simmons is not entitled to the relief sought.

The finding as to the first cause of action is that "there was and is no consideration for the said written instrument executed by plaintiff and defendant Clark . . . [Exhibit A]; that it is true that plaintiff has received nothing in consideration of, or for, said written instrument," and that "it is true that . . . plaintiff executed and entered into the licensing agreement . . . referred to . . . as Exhibit B, in pursuance and consideration of the aforementioned written instrument . . . Exhibit A; that it is true that there was, and is, no consideration for said licensing agreement, Exhibit B, insofar as said agreement purports to confer rights upon California Institute of Technology; that it is true that plaintiff has received nothing in consideration of, or for, said licensing agreement insofar as it purports to confer rights upon . . . California Institute of Technology." Another finding was stated in the following terms: "That it is not true that the aforementioned instrument . . . Exhibit A, was at any time and/or now is, supported by a valid and/or valuable consideration, or any consideration whatsoever; that it is not true that the aforementioned licensing agreement . . . Exhibit B, insofar as the same purports to confer rights upon . . . [the] Institute, was at any time and/or now is, supported by a valid and/or valuable consideration, or any consideration whatsoever."

The findings clearly show that the trial court treated Exhibit "A" as a memorandum of a contract between Simmons and the Institute resulting from the negotiations between him and Dr. Clark. Exhibit "B" is a third party beneficiary contract between Simmons and Baldwin, under which the Institute is the beneficiary.

▉▉ The finding that Exhibit "A" was executed by Sim-

mons without consideration on the part of the Institute is supported by the evidence. The true consideration of a contract may be shown by extrinsic evidence (*Shiver* v. *Liberty Bldg.-Loan Assn.*, 16 Cal.2d 296 [106 P.2d 4]; *Johnston* v. *Courtial*, 216 Cal. 506 [14 P.2d 771]), and the record includes testimony to the effect that both Simmons and Dr. Clark understood the phrase, "in consideration of employment," which appears in Exhibit "A" as referring to past employment. ■ Such employment is inadequate consideration to support a contract, and the promises of Simmons to grant licenses to use his invention only upon approval by the Institute and to pay royalties to the Institute were made without any counterpromise by the Institute.

The appellants argue that there are three "aspects of consideration," any one of which is sufficient to support the promises of Simmons. First, it is said that Simmons was re-employed by the Institute after the term under which he was serving had expired. Secondly, the appellants assert that the agreements were made as a compromise of a dispute between Simmons and the Institute regarding the Institute's claim to an interest in the patent. Finally, they rely upon the services rendered by the Institute, through Dr. Clark, in handling the negotiations of the contract with Baldwin as constituting sufficient and adequate consideration.

■ But the consideration for a promise must be an act or a return promise, bargained for and given in exchange for the promise. (*Bard* v. *Kent*, 19 Cal.2d 449 [122 P.2d 8, 139 A.L.R. 1032]; *Tiffany & Co.* v. *Spreckels*, 202 Cal. 778 [262 P. 742]; *Williams* v. *Hasshagen*, 166 Cal. 386 [137 P. 9]; *Lasar* v. *Johnson*, 125 Cal. 549 [58 P. 161]; Rest., Contracts, § 75; see Williston, Contracts, [rev. ed.] §§ 61, 100, 102, 102a.) In the words of section 75 of the Restatement of Contracts (com. b): "Consideration must actually be bargained for as the exchange for the promise . . . The existence or non-existence of a bargain where something has been parted with by the promisee or received by the promisor depends upon the manifested intention of the parties . . . The fact that the promisee relies on the promise to his injury, or the promisor gains some advantage therefrom, does not establish consideration without the element of bargain or agreed exchange." (Language approved in *Bard* v. *Kent, supra,* p. 452.) ■ In the present case, the evidence shows, and the trial court necessarily found, that it was the past employment of Simmons, and not the promises or acts suggested by the appellants,

which the parties contemplated as the consideration for Simmons' promises. His promises, therefore, were made gratuitously and may be revoked by cancellation or rescission of the instruments. (*Baltimore & Ohio R. Co.* v. *Evans*, 188 F. 8 [110 C.C.A. 156] ; 1 Black on Rescission and Cancellation, (2d ed.) § 157, p. 458 et seq.)

The trial court found that, insofar as the third party beneficiary provision of Exhibit ''B'' is concerned, it was executed ''in pursuance and consideration of'' the contract evidenced by Exhibit ''A.'' It necessarily follows that if the prior contract was rescinded for lack of consideration, the beneficiary provisions of Exhibit ''B,'' which were based thereon, are unsupported by consideration and also may be rescinded. The judgment was rendered upon this theory.

The findings of the trial court in favor of Simmons on the issue of fraud are likewise supported by the record. It clearly appears that, apart from the question of the consideration bargained for, Simmons was induced to enter into the contracts in reliance upon certain misrepresentations by Dr. Clark. As a young man, experimenting on the borderland of what appeared to be a vast new field of scientific and engineering development, he was greatly impressed with the importance of the work being conducted at Impact Research. ''It was a new field,'' he explained, ''the matter of dynamic testing materials was just becoming of importance at that time, and I was extremely interested in that particular subject, and the instrumentation useful in such investigations, and I think we mutually agreed that the money could be well used in Impact work.''

The substantial evidence which supports these findings places them beyond the reach of an appellate court. (*DeYoung* v. *DeYoung*, 27 Cal.2d 521 [165 P.2d 457] ; *Viner* v. *Untrecht*, 26 Cal.2d 261 [158 P.2d 3] ; *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500 [106 P.2d 886] ; *Raggio* v. *Mallory*, 10 Cal.2d 723 [76 P.2d 660] ; *Albaugh* v. *Mt. Shasta Power Corp.*, 9 Cal.2d 751 [73 P.2d 217] ; *Gane* v. *Gane*, 6 Cal.2d 145 [56 P.2d 948] ; *Bellon* v. *Silver Gate Theatres, Inc.*, 4 Cal. 2d 1 [47 P.2d 462] ; *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183].) Moreover, the determination that Dr. Clark was employed by the Institute, but that his acts and representations were not authorized or ratified by it is not inconsistent with other conclusions in favor of Simmons, for ''the rule is now firmly established that a rescission of con-

tract may be had against even an innocent principal because of unauthorized misrepresentations by his agent.'' (*Greenberg* v. *DuBain Realty Corp.*, 2 Cal.2d 628, 629 [42 P.2d 628]; and see *Weiner* v. *Roof*, 10 Cal.2d 450, 453 [74 P.2d 736].)

The Institute and Dr. Clark assert that it was error to have admitted parol evidence of such promissory fraud, because it is ''at variance with the contractual features of the writing.'' The determinative question upon this issue is ''whether the writing was intended to cover a certain subject of negotiation; for if it was not, then the writing does not embody the transaction on that subject, and one of the circumstances of decision will be whether the one subject is so associated with the other that they are in effect 'parts' of the same transaction, and therefore, if reduced to writing at all, they must be governed by the same writing.'' (9 Wigmore on Evidence, § 2430, p. 97.)

█ It is clear that ''where the execution of a contract has been induced by a promise made without any intention of performing it, this constitutes such fraud in obtaining the contract that it may be declared null and void'' but that ''a distinction must be made between . . . a parol promise . . ., which by its very nature is superseded by the final writing, inconsistent with it, and a promise made with no intention of performing the same, not inconsistent with the writing, but which was the inducing cause thereof.'' (*Cobbs* v. *Cobbs*, 53 Cal.App.2d 780, 783, 785 [128 P.2d 373].) █ Exhibit ''A'' provided that ''the royalty on said invention shall be paid to the . . . Institute, or committees or other agencies or bodies which the . . . Institute may designate. . . .'' The promises of Dr. Clark were that the money, although paid to the Institute as a matter of administrative procedure, nevertheless was to be used exclusively for Impact Research. Therefore, the promise was directed to the matter of the *use* of the money, whereas the terms of the memorandum dealt with nothing more than the form of the payment of it. These promises by Dr. Clark as to the use of the royalties were the fraudulent inducement, or motive, for the contract, but they were not incorporated in or superseded by the terms of the agreement as to payment. The two are not inconsistent or ''at variance,'' inasmuch as they deal with wholly different matters. It was, therefore, proper to receive parol evidence to prove the promises of Dr. Clark. (*Stockburger* v. *Dolan*, 14 Cal.2d 313 [94 P.2d 33, 128 A.L.R. 83]; *Buckner* v. *Leon & Co.*, 204 Cal. 225 [267 P. 693]; *Whittier* v. *Home Sav. Bank*,

161 Cal. 311 [119 P. 92] ; *Savings Bank of So. Cal.* v. *Asbury,* 117 Cal. 96 [48 P. 1081] ; *Lindsay* v. *Mack,* 5 Cal.App.2d 491 [43 P.2d 350] ; *Gardiner* v. *Burket,* 3 Cal.App.2d 666 [40 P.2d 279].)

The argument of the appellants that Simmons is not entitled to the relief which he seeks is in two parts. The first, directed to Exhibit "A," is that he failed to tender or return the benefits received. This argument assumes that something other than past employment was the intended consideration for the promises of Simmons. But as he received no benefits in return for his promise, he is not required to tender or return any amounts paid to him. The second part of the argument, directed to Exhibit "B," is that a rescission must be total and not partial; that Simmons may not rescind as to the burdens imposed upon him while retaining the benefits.

The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions. (*Buena Vista Fruit Co.* v. *Tuohy,* 107 Cal. 243 [40 P. 386] ; *Bohall* v. *Diller,* 41 Cal. 532 ; *Purdy* v. *Bullard,* 41 Cal. 444 ; *Jones* v. *Bay Cities Electric Co.,* 22 Cal.App. 81 [133 P. 492].) The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate.

This rule, however, is not controlling in the case of a severable or divisible contract such as Exhibit "B." Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable. (*Traiman* v. *Rappaport,* 41 F.2d 336, 71 A.L.R. 475.) And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes. (*In re Marshall's Garage,* 63 F.2d 759 ; *Ireland* v. *Craggs,* 56 F.2d 785 ; *Cosden Oil Co.* v. *Scarborough,* 55 F.2d 634.) Here there was a total rescission of the provisions relating to the Institute, and they are clearly severable from the terms and conditions applicable to Baldwin. And "where a good cause for rescission exists as to one part of a divisible or separable contract, such portion may be rescinded in equity without disturbing the remainder." (*Hesselberg* v. *Aetna Life Ins. Co.,* 102 F.2d 23, 25.) The rescission as to the Institute is total, not

partial. No injustice is done the Institute by Simmons' failure to rescind as to Baldwin, and the Institute has incurred no injury if Simmons and Baldwin, as between themselves, elect to be bound by Exhibit "B." By the terms of the decree of the trial court, the Institute and Simmons have been placed *in status quo.*

As to royalties already received by the Institute, they were paid under a contract induced by fraud and executed in the mistaken belief that, under the terms of Exhibit "A," Simmons owed an obligation to the Institute. In such a situation the principles of unjust enrichment and restitution require that such monies may not be retained. (See Restatement of Restitutions, §§ 5, 133[1].)

There is no merit in the argument, made for the first time upon appeal, that the judgment is improper because Baldwin was not made a party to the action. Exhibit "A" is a memorandum of an agreement between Simmons and the Institute; Baldwin has no rights or interests dependent upon or arising from that agreement. It is, therefore, only as the judgment may purport to affect Exhibit "B," the contract between Simmons and Baldwin, that the licensee could have any direct interest. However, the trial court made no finding as to Baldwin's interests under that contract; it expressly restricted the determination of the rights as between Simmons and the Institute to the amount of royalties paid or to be paid pursuant to the contract. Baldwin continues to receive the benefit it contracted for, the right to manufacture the invention; it is under obligation to pay the same amount in royalties for that privilege and probably it is of no consequence to Baldwin to whom that money is paid. If it is, that company may raise such defense in any action hereafter brought by Simmons to collect royalties.

The interests of Baldwin under the contract are "so separable that a decree may be rendered between the parties before the court without affecting . . . [them, so that they] may perhaps be 'necessary' parties to a complete settlement of the entire controversy or transaction, but are not 'indispensable' to any valid judgment . . . They should normally be joined . . . [b]ut, since the rule . . . [as to joinder of necessary parties] is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicality. Where, for example, it is impossible to find these other persons or impracticable to bring them in, the action may proceed as to those parties who are present." (*Bank of Cali-*

*fornia* v. *Superior Court,* 16 Cal.2d 516, 523 [106 P.2d 879].)

The fact that Baldwin is a foreign corporation may have placed some difficulty in the way of making it a party to this litigation had Simmons been disposed to do so. But he was satisfied to proceed solely against the Institute and Clark and must accept the responsibility of a judgment which does not bind Baldwin. Any dispute between Simmons and Baldwin has not been settled by this judgment, and Baldwin is in no way bound by it.

The judgment is affirmed.

Gibson, C. J., Traynor, J., and Peters, J. pro tem., concurred.

CARTER, J.—I concur in the conclusion reached in the majority opinion, but I do not agree with the reasons on which it is based.

From the facts as disclosed by the record it appears that we have what is, in effect, a third party donee beneficiary contract. There are, in the case, two Exhibits, "A" and "B." Exhibit "A" which was signed only by Simmons, the plaintiff, bears the date of February 21, 1940, and is entitled "Agreement." It appears that this instrument was prepared by counsel for The Baldwin Locomotive Works, and it recites that Simmons will not grant any licenses to make, use or sell his invention unless approval therefor is given by the Institute. It also recites that any royalties received for the use of such license to use, etc., shall be paid to the Institute, unless, he at his option, requests in writing a certain percentage thereof. Exhibit "B" is dated March 13, 1940, and purports to be an agreement between plaintiff and the Baldwin Company and is signed by both of them. This agreement reads, in part, as follows: "THIS AGREEMENT made as of March 13, 1940, between EDWARD E. SIMMONS, JR., of Pasadena, California, and THE BALDWIN LOCOMOTIVE WORKS of Philadelphia Pennsylvania, a corporation organized and existing under the laws of the State of Pennsylvania hereinafter respectively referred to as 'SIMMONS' and 'BALDWIN'. This agreement is subject to the approval of the CALIFORNIA INSTITUTE OF TECHNOLOGY, OR COMMITTEES OR OTHER AGENCIES OR BODIES WHICH THE CALIFORNIA INSTITUTE OF TECHNOLOGY MAY DESIGNATE, hereinafter referred to as 'INSTITUTE'." Clause (8) provides: "Any part of this agreement may be altered without effect on the remaining portions thereof by mutual agreement between Baldwin, Simmons and the Institute." Clause (11)

provides that: "The terms and conditions herein set forth are not subject to change without the approval of the California Institute of Technology."

This is the situation with which we are confronted: Simmons, due to the representations of agents of the Institute, agreed that the royalties were to be paid to the Institute to be used by it for Impact Research. The funds were not so used. Under the rule set forth in the majority opinion, that even an innocent principal is bound by the unauthorized misrepresentations of his agent, we have the principal—the Institute—bound by the misrepresentations of its employees. We find a promise on the part of Simmons to grant a license to Baldwin to use his invention, and a promise on the part of Baldwin to pay the royalties to the Institute. The Institute, having given no consideration for this promised benefit is in the position of a donee beneficiary. Not only that, but it achieved this benefit through the fraud of its agents, even though that fraud may not have been authorized by it.

"There are two quite distinct types of cases which pass current under the name of promises for the benefit of a third person. To the first class belong promises where the promisee has no pecuniary interest in the performance of the contract, his object in entering into it being the benefit of a third person. To the second class belong promises where the promisee seeks indirectly to discharge an obligation of his own to a third person by securing from the promisor a promise to pay his creditor.

"The first class is properly called a contract for the benefit of a third person, and the phrase 'sole beneficiary' should be reserved for this class. As the promisee has no pecuniary interest in the performance of the promise, he can have, generally speaking, no other intention than to benefit the third person, to give him a right." (Samuel Williston, *Contracts for the Benefit of a Third Person,* 15 Harv.L.Rev. 767.)

It was proved at the trial that the words "in consideration of employment" found in Exhibit "A" were intended by both Simmons and Dr. Clark to mean Simmons' *past* employment by the Institute. In plaintiff's first amended complaint, as his first cause of action, he alleges that both Exhibit "A" and Exhibit "B" are without consideration and therefore null and void as to the Institute. In its findings of fact, the trial court found these allegations to be true. In plaintiff's second cause of action, the plaintiff alleges that he was induced to enter into the two agreements because of promises

made by the Institute that he would be employed on a permanent basis and that the monies received by the Institute from Baldwin would be applied to Impact Research. He also alleged that the Institute never intended to perform these promises. These allegations the trial court, in its findings of fact, found to be true. The trial court, in its conclusions of law, found that both instruments, as to the Institute, were null and void, and that the Institute had no right, title or interest in or to the royalties accrued or to accrue from Baldwin.

If it is true that plaintiff entered into the contract upon the understanding *that he was to be given permanent employment* and that the royalties to be paid by Baldwin were to be used by the Institute for Impact Research, then at the time the contract was made, there was consideration. The Restatement of Contracts, section 274, provides: "In promises for an agreed exchange, any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional. An immaterial failure does not operate as such a discharge." Comment b: "Consideration, as used in the phrase, failure of consideration, means merely an exchange in fact agreed upon. Failure of consideration, therefore, is failure to receive such an exchange. In the formation of contracts, consideration is the exchange for a promise. In the present connection the consideration in question is the promised performance of one party agreed to be exchanged for that of the other." If the allegations in plaintiff's first cause of action are true, this is the situation: Plaintiff promises to grant a license to Baldwin. In consideration of this promise Baldwin promises to pay royalties to the Institute and in exchange for these promises, the Institute promises to employ Simmons on a permanent basis, and to use the money received from Baldwin for Impact Research. Thus, if this situation is the true one, there was consideration present at the time the contract was entered into. Section 473 of the Restatement of Contracts provides: "A *contractual promise* made with the undisclosed intention of not performing it is fraud." [Emphasis added.]

However, the trial court, in its conclusions of law, adjudged that both exhibits were, as to the Institute, null and void, presumably because of lack of consideration. It would seem to me that the findings of fact with respect to the fact that neither Exhibit "A" nor Exhibit "B" were supported by

consideration so far as the Institute was concerned are consistent with the conclusion of law that the exhibits were null and void. However, if the findings of fact as to the fraud of the Institute mean that plaintiff was induced to enter into the agreement because of promises made without intention of performance, then the conclusions of law are inconsistent, *because there was, at the time of the formation of the contract, consideration.* And, due to the fraud of the Institute, there has been a *failure* of consideration in that plaintiff did not receive what he bargained for, and thus he may rescind as to the Institute as to future monies to be paid by Baldwin, and be placed *in statu quo* as to monies paid to the Institute prior to the commencement of this action.

If, however, the findings of fact as to *lack* of consideration and the conclusion of law to the same effect are taken into consideration, then there is consistency. Since it was proved at the trial that plaintiff and the Institute were both referring to the *past* employment of plaintiff by the Institute, we have a finding of fact by the trial court which is not supported by the evidence. Disregarding that finding of fact, because it is inconsistent with the conclusion of law, we have this situation: Plaintiff intended the money paid by Baldwin to the Institute to be used by the Institute for Impact Research. That was his reason for entering into the agreement. The Institute did not so use the money. Plaintiff was under no obligation other than to grant the license to Baldwin. The general rule is that findings are to be harmonized and reconciled if it is possible and can be done reasonably. (*Stohr* v. *Stohr,* 148 Cal. 180 [82 P. 777]; *Davis* v. *Martin,* 157 Cal. 657 [108 P. 866]; *Lasher* v. *Faw,* 209 Cal. 726 [289 P. 821]; *Culjac* v. *Better Built Homes, Inc.,* 58 Cal.App.2d 720 [137 P.2d 492]; *Menghetti* v. *Dillon,* 10 Cal.2d 470 [75 P.2d 596]; *Pacific Coast etc. Land Bank* v. *Jones,* 14 Cal.2d 8 [92 P.2d 390, 123 A.L.R. 695]. Also, inferences which necessarily follow from findings may be resorted to. (*People* v. *Ocean Shore R., Inc.,* 22 Cal.App.2d 657 [72 P.2d 167].) Where the facts found support the conclusions necessary to the judgment, inconsistent conclusions stated in the findings will be disregarded. (*Danziger* v. *Benson,* 175 Cal. 565 [166 P. 313].) ''In many cases the purpose of the promisee in securing a promise for the benefit of a third party is to confer a gratuitous benefit upon that third party. In such cases this third party will usually be the only person who will be benefited by the promised performance; he will be the sole beneficiary. *Performance will*

*not benefit the promisee; he is not to receive it,* and such performance will not discharge any duty of the promisee, for he owes none to the beneficiary. (Arthur L. Corbin, Contracts for the Benefit of Third Persons, Selected Readings on the Law of Contracts, Association of American Law Schools (1931 ed.), pp. 648, 663-665.

The authorities are strangely silent on this state of affairs—where the fraud is that of a donee. The usual situation is where fraud on the part of either the promisor or the promisee has brought about the contract for the benefit of a third person. The problem is analogous to that of the fraud of a third person. The Restatement of the Law of Contracts, section 477, states the rule thus: "Fraud or material misrepresentation by a third person renders a transaction voidable by a party induced thereby to enter into it if the other party thereto (a) has reason to know of the fraud or misrepresentation before he has given or promised in good faith something of value in the transaction or changed his position materially by reason of the transaction, or (b) is affected by the fraud or misrepresentation under the law of Agency or Trusts." This is commented on as follows: "As between the original parties to a transaction induced by the fraud or material misrepresentations of a third person, the injured party has power of avoidance, unless the other party is not only ignorant of the fraud or misrepresentation when he enters into the transaction, but has either parted with value or has changed his position materially in reliance on the transaction. A donee cannot conscientiously retain an advantage obtained from another because of a third person's misconduct, even if the donee neither knew nor had reason to know of it."

It would seem that under this rule the plaintiff could not rescind the contract as to Baldwin. Baldwin did not know of the fraud and was in no way concerned with it. The only fraud is that of the Institute who is the recipient of the royalties paid by Baldwin. If the case is viewed as one where a gift was made because of fraudulent representations, we find that such a gift may be avoided by the donor. "A gift obtained from the donor by fraud or by the pressure of undue influence upon his mind and will may be set aside in equity and the property recovered. . . .

"But it is to be remembered that an executed gift, even though procured through fraud, mistake, or undue influence, or made by one lacking in mental capacity, is voidable only.

. . . It passes title to the property to the donee, where it remains until a disaffirmance by the donor, or perhaps by his executor after his death;. . . .'' (Black, on Rescission and Cancellation (2d ed.), pp. 1257-1258.)

Or the situation may be considered as analogous to that of a contract of insurance. Let us assume that A induces B through fraudulent representations to make him the beneficiary of a contract of insurance between B and the X Company. B reserves no power to change the beneficiary. The contract between B and the X Company is perfectly valid, and yet had it not been for A's fraud, B would not have named him as beneficiary, but would have named his own estate.

The Restatement of the Law of Restitution, section 26, provides (1) a person is entitled to restitution from another to whom gratuitously and induced thereto by a mistake of fact he has given money or the mistake (a) was caused by fraud or material misrepresentation,. . . . The comment is as follows: ''Fraud and misrepresentation: If the donor has been induced to make the gift because of the fraud or innocent misrepresentation of the donee although it would not have affected the conduct of a reasonable man, the transaction can be rescinded.''

Although the general rule undoubtedly is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions, there are certain exceptions where the circumstances justify a rescission only as to particular matters or particular parties involved in an entire transaction. (*Hoffman* v. *Kirby,* 136 Cal. 26 [68 P. 321] ; 12 C.J.S. § 78b, p. 1080; Civ. Code, § 3414.) In the present case, if the donee Institute were allowed to retain the fruits of its own fraud, it would be unjustly enriched at the expense of the plaintiff.

Plaintiff should, therefore, be entitled to restitution of the benefits previously received by defendant Institute as well as receive any which may accrue in the future.

SCHAUER, J.—I dissent.

This case has been a peculiarly difficult one for the court to resolve with any satisfaction either to itself or the parties. The condition of the record is lamentable in several respects. I dislike to add a dissent to the discussion in the majority opinion but because I think that opinion reaches certain erroneous conclusions of law and of fact and because such errors,

with the implications of the opinion, may have a grave import to the Institute and to Dr. Clark, I deem it proper to show why I think a different result should be reached.

After extended study of the entire record I am of the view that the evidence does not support the finding that there was a total lack of consideration from the Institute for its benefits under the contract. On any tenable view of the evidence, in my opinion, the contract between Simmons and the Institute necessarily represents a settlement of their conflicting claims in the Impact Research project; the settlement of mutually conflicting claims constitutes legal consideration for the benefits thereby reciprocally given and received. Furthermore, it is my view that defendants are correct in their contention that Dr. Clark's asserted fraudulent promises cannot be shown to invalidate the agreement because ''where the promise relied upon to establish the fraud is at variance with the contractual features of the writing, the same may not be proven either as an element of inducement or otherwise.''

Impact Research at the Institute encompassed something more than Mr. Simmons, his inventions and his employment. The research in this field was well under way before Mr. Simmons was called into it. It was not a part of the Institute's regular educational curriculum; it was a commercially sponsored venture which ''was to be divided into two phases, one the development of equipment [including the impact dynamometer], the method of procedure by which we could determine force time relations. The second phase was to be by applying that procedure, equipment and so forth, in the actual testing of a large number of metals and alloys to determine their response to rapid loading.''

The development of Impact Research is described in the undisputed testimony of Dr. Clark. ''That project had a gradual evolution, which started back, I presume, about in . . . 1934, when I became interested in the general subject. A little later on . . . Doctor Datwyler . . . became interested in this project of the dynamics of materials, and we set about to make some experiments at quite high velocities by using explosives and so on. Such work was principally paid for out of my own pocket, and a small amount out of the institute funds. We obtained some preliminary data for which also we acknowledge with gratitude the efforts of Mr. Simmons in the participation with us in our personal activities in that regard. . . . None of us were compensated. His assistance was

primarily in giving us some suggestions for this, that and the other thing [including the development of an explosive bomb device in the summer of 1935], and procuring from electrical engineering certain equipment that we wanted. That more or less congealed our ideas in respect to impact, and led us to the belief that we could get most from our experiment if we could determine the force acting during the impact over very short periods of time. We [Clark and Datwyler] proposed the details of our ideas to the Chairman of the Executive Council, who thought well of our fundamental plan for really going into the matter of Impact testing, whereupon a meeting was held with industrial firms to determine whether or not they would be willing to give support for such a project, and shortly thereafter—that was the fall of 1936, I believe,—some industrial firms saw fit to sponsor this project." In about October, 1936, Impact Research was organized under commercial sponsorship. Dr. Clark was its director. "Doctor Datwyler was the first paid research assistant on the project, and he proceeded to investigate the possibilities of various methods of determining force time relations . . . Doctor Datwyler examined into many different possible methods . . . Those tests in general were quite rank failures . . . and during that time Mr. Simmons was in consultation with us purely as a matter of discussion on those things."

The device which Dr. Datwyler was attempting to develop was an impact dynamometer; i. e., an instrument to translate "instantaneous forces into instantaneous electric impulses so that they will be recorded by means of an oscillograph." He was engaged in this particular phase of the work even before the completion in approximately October, 1936, of the more or less formal organization of Impact Research as a commercially sponsored project. The dynamometer itself was not a new device, but he was unsuccessful in finding a strain sensitive element which would make it workable in measuring impacts. After various experiments (frankly described in Dr. Clark's above quoted testimony as "rank failures") Clark and Datwyler, in the latter part of August, 1936, requested plaintiff's aid on this problem. Early in September, 1936, plaintiff conceived and communicated to Datwyler a proposed solution, the use of a thin wire bonded to the dynamometer bar with a material called glyptal. Pursuant to plaintiff's suggestions, and with plaintiff participating in the work of construction, Datwyler constructed a dynamometer. This instrument was improved in various respects pursuant

to Datwyler's and plaintiff's further ideas as to how to overcome various defects, and within a month after plaintiff's original suggestion a successful instrument had been constructed. Plaintiff during this time was not employed by the Institute and he received no pay for his work in inventing the wire strain gauge and assisting in its application to the dynamometer, other than the consideration provided for in the contract evidenced by Exhibits A and B, hereinafter set forth in footnote 1.

On December 11, 1936, two months after the dynamometer had been completed, plaintiff for the first time was employed for pay in Impact Research. Nearly three years later, in the fall of 1939, a representative of Baldwin visited plaintiff and Clark at the Impact Research laboratory and informed them that Baldwin was interested in obtaining patent protection for, and exploiting, the wire strain gauge. Prior to this time, so far as the evidence shows, neither party had expressly stated any opinion as to, or claim of, ownership of the dynamometer using the wire strain gauge. The Institute, having successfully developed the dynamometer employing the gauge, which may be said to have constituted the first phase of the Impact Research project, had simply been carrying on the second phase of that project, which, as previously indicated, involved the use of the dynamometer. The gauge, according to Simmons' own language, "was voluntarily given to Impact." But after Baldwin suggested its interest in patenting and exploiting the impact-measuring device, there followed the discussions between plaintiff and Dr. Clark, and the negotiations with representatives of Baldwin, which culminated in the execution of Exhibits A[1] and B[2].

---

[1] Exhibit A was executed by plaintiff and signed by Dr. Clark as "Witness" on February 21, 1940. It reads in material part as follows: "In consideration of my employment by the California Institute of Technology I agree that as to my inventions . . . I will not grant any licenses to make, use or sell apparatus or methods embodying any of said inventions unless such licenses are approved by the . . . Institute . . . The royalty on said inventions shall be paid to the . . . Institute . . ., unless at my option I shall request . . . that up to and including forty per cent (40%) of the total royalty paid by any licensee shall be paid to me . . . I agree not to grant any license or make any assignment of said inventions or patent rights thereto without the express consent of the . . . Institute."

[2] Exhibit B is dated March 13, 1940, and reads in material part as follows: "AGREEMENT . . . between . . . 'SIMMONS' and 'BALDWIN.' This agreement is subject to the approval of the . . . 'INSTITUTE.'

"WHEREAS, Simmons has made certain inventions . . . Baldwin is

The discussions between plaintiff and Clark chiefly concerned three matters: Plaintiff's future employment at the Institute, the use of the Baldwin royalties in Impact Research, and the respective interests of plaintiff and the Institute in the invention. The evidence as to what was said and done by plaintiff and Clark as to these three matters shows, I think beyond question, that there was, as a matter of law, consideration bargained for and exchanged between plaintiff and the Institute by the mutual settlement of their disputed claims of interest in the invention. I have noted that plaintiff urges that "All that the evidence established was that Clark, himself, had the *belief* that the Institute had an equity or interest in the in-

desirous of obtaining an exclusive license to make or have made for use and/or sale apparatus embodying said inventions.

"Now, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed as follows:

"1. Simmons hereby grants to Baldwin an exclusive license . . . SUBJECT, HOWEVER, to the following reservations: . . . [The Institute, Simmons, and Dr. Clark are each] licensed to make and use for his own use apparatus embodying said inventions . . . The sponsors of Impact Research [commercial firms which paid for the research project wherein the inventions were made] . . . are licensed to make and use for their own research and testing only, apparatus embodying said inventions . . . Gottfried Datwyler [who worked with Dr. Clark and plaintiff in Impact Research] may be granted a non-exclusive license for the country of Switzerland . . .

"2. Baldwin agrees at its own expense and without recourse whatsoever to Simmons or to the Institute to . . . prosecute an application . . . for United States Letters Patent on said inventions and to pay all fees in connection therewith. Baldwin shall have full control of the prosecution of such applications. Baldwin agrees not to permit any patentable item contained in the said application . . . to be lost by abandonment . . .

"3. Baldwin agrees to prosecute or settle any interference or infringement matter . . . without recourse to Simmons or the Institute . . .

"4. Baldwin agrees to pay a royalty of five per cent . . . to the Institute, unless Simmons at his option shall request . . . that any portion up to and including forty per cent (40%) of said royalty shall be paid to him by Baldwin . . .

"EDWARD E. SIMMONS, JR.
"THE BALDWIN LOCOMOTIVE WORKS
"By ─────────────────
        Vice-President

"The granting of the foregoing license is approved by the California Institute of Technology in accordance with an agreement between Edward E. Simmons, Jr., and the California Institute of Technology dated February 21, 1940.

"CALIFORNIA INSTITUTE OF TECHNOLOGY
"By: A. C. BALCH
        Pres.

[There seems to be no evidence that Baldwin, through its officers, signed Exhibit B; this has not been mentioned by the parties to this action.]"

vention . . . Now, we submit, Clark's own belief, and the opinions of others on the Institute campus, certainly were not tantamount to the assertion of any claim by the Institute, through its properly authorized officials, that it had any interest in or to ownership of the invention or patent.'' But I think that the record, on any reasonable view, does not sustain plaintiff's position on this point.

The writings define the rights of the three parties in ''inventions involving an electrical strain gauge wire'' and ''inventions relating to the measurements and indications of various conditions including impact testing''; they refer to these inventions as having been made by Simmons. There is no doubt that the wire strain gauge element of the dynamometer was conceived by Simmons alone, at a time when he was not employed by or a student at the Institute, although he was then on campus and had been and expected again to be (and was again) both an employe and a graduate student. It is apparent from the writings' description of the ''inventions'' which are the subject of agreement that the devices which Baldwin agreed to patent, to exploit, etc., include not only the wire strain gauge but also that gauge set up in useful fashion with the dynamometer, oscillograph, etc. Of course, neither Simmons nor the Institute makes any claim to having ''invented'' such devices as the oscillograph and the dynamometer. But both Simmons and the Institute claimed rights in the applications of those devices, with the wire strain gauge, which were developed by Simmons and Datwyler. The following testimony shows that there was a bona fide dispute between Simmons and Clark as to the respective interests of Simmons and the Institute (such words as ''equity,'' ''owned,'' etc., are not, it is clear from the whole of the testimony, used therein in any technical sense):

Plaintiff testified that during the discussions which led up to the execution of the writings ''Doctor Clark took the position that due to moral considerations, the Institute had a claim on . . . this patent . . . Doctor Clark made claims that the Institute had some sort of moral claim, and at no time did he make any claim that the Institute had a legal right to the inventions . . . [I]n substance [Doctor Clark] said that inasmuch as my work at the Institute and the fact I had been paid by the Institute for working, I had a moral obligation to assign the patent to the Institute, on which occasion I objected to that point of view, and I said that inasmuch as the

actual invention of the gauge was made on my own time and *was voluntarily given to Impact* [italics added], that I felt that the patent was entirely mine, and also, as I had always understood it, the Institute was not engaged in the commercial or patent activity, and that they had never held any claims against anybody's inventions, that is, made by people at the Institute.'' It is thus apparent from plaintiff's own testimony that he had ''voluntarily given to Impact'' the invention in question and that, after becoming more aware of its possible value, he was seeking to get it back. He was asserting a claim to that which he had previously freely donated. Simmons was also asked the following question: '' [Clark] claimed that the Institute was entitled to some equity in your invention, and you disputed that. That is the size of it at the present time?'' He answered, ''That is right,'' but further explained that the word ''equity'' was not used in his discussions with Clark. Simmons testified, further, that ''Doctor Clark had the belief that the Institute owned everything that was developed there, and that opinion was held by other people on the campus . . . I don't think that Doctor Clark actually made the statement that the Institute owned everything; ''owned,''—there is a matter of words which I had no intent of them being strictly applied legally. Doctor Clark expressed at all times that the Institute had some sort of moral claim or right arising from patents developed at the Institute, in which case he stated that if he had a patent, why, he would give it to the Institute on moral grounds. He never at any time said that the Institute had a legal ground, nor did he ever discuss legal grounds; in fact, Doctor Clark told me on one occasion that he had no knowledge of legal matters and he wasn't bringing this matter of a legal matter of the Institute having an ownership, but purely as a matter of moral consideration . . . Prior to this interest by Baldwin . . . there had never been any discussions [between plaintiff and Clark] on patent matters or Institute rights or anything else . . . There was never any discussions about assigning the entire interest [in the inventions] to the Institute, or assigning any interest to the Institute . . . the discussions were that Doctor Clark told me that the Institute had a moral interest in the inventions . . . In one of the discussions along this line he stated that it would be nice to have these royalties paid to the Institute funds so that they could be used for Impact, and I agreed with that point . . . but inasmuch as it looked at that time . . . like it would be a fairly

good commercial product, and I could see the proposition arising whereby there might actually be more funds than Impact could use at a given period, and I wanted to reserve the right to draw part of those funds . . . I suggested 40 per cent, and Doctor Clark agreed . . . There was no other discussion of 60 or 30 or 20 [per cent] or whatever it might be . . . I never had any discussions about assigning everything to Cal. Tech. Q. Have you ever had any discussion of assigning any particular amount other than 40 per cent? . . . A. No. In other words, when it came to a discussion, this percentage, it was set and fixed . . . Never had any discussion nor saw any writings . . . regarding an entire assignment or a partial assignment of the patent to California Institute of Technology. It was never discussed. . . . Nothing was said about the Institute's claim or 100 per cent [as opposed to 10 per cent or 60 per cent] ; in other words, we had already months before agreed among ourselves that all the money would go to Impact.'' In his deposition plaintiff was asked, '' [Doctor Clark] took the position . . . that the Institute was entitled to the sole patent right, is that it, did he go that far? A. Yes, that was his position . . . he, among all out there, was the strongest of that opinion, I believe, and these conversations from time to time over a period involved arguments why I should assign this, and what benefits I would derive from being at the Institute.''

Counsel for the Institute stated, ''We admit that Mr. Simmons was the owner of the patents or patent on the device *subject to our rights under these two agreements.''* (Italics added.)

Dr. Clark testified that after Baldwin expressed its desire to exploit the inventions ''the matter of the Institute's interest in this whole matter was set forth by myself, and was discussed from that time on between Simmons and me . . . I pointed out what, in my belief, was the Institute's interest, not necessarily the Institute's position . . . The substance of what I said, insofar as I can recollect, is that this device had been devised as a result of our requirements, devised at the Institute in conjunction with the activities of Doctor Datwyler, and that it was my firm belief that the Institute had definite interests in such development, and that it was recognized that Simmons had conceived the idea. Simmons took issue with me on the point that the Institute had any

interest or right in the matter, and that led to continual discussions . . . until the culmination of the final draft, or agreement, which was signed . . . [Simmons stated that] it was his invention, that the Institute had no right or interest, therefore, in the invention . . . Q. . . .you did tell Mr. Simmons . . . during the course of those conversations which led up to . . . Exhibit A . . . that the school had an interest in this invention because he had been paid for the time during which he had made the invention? A. Partially so; in addition, for doing it at the Institute with the Institute's facilities. Q. And you sincerely believe that the Institute did have an interest or equity of some kind by reason of those facts? A. Yes, I do . . . [M]y recollection is that the point being that this matter of paying all of the royalties to the Institute and my inability to agree that they would be devoted to Impact Research gave rise to Mr. Simmons' desire to withdraw forty per cent of those royalties for his own use.''

The trial court, its findings indicate, disbelieved Dr. Clark's statement as to his "inability to agree that they [royalties] would be devoted to Impact Research'' and believed plaintiff's statement that "we . . . agreed among ourselves that all the money would go to Impact.'' Whether Clark or plaintiff is believed as to this aspect of the controversy, the above quoted evidence, upon any reasonable view, shows indisputably that plaintiff and Dr. Clark were in disagreement as to the respective interests of plaintiff and the Institute in the inventions; that plaintiff had originally "voluntarily given to Impact'' the invention in question but that he wished to reclaim it, or some interest in it, for his private account; that both plaintiff and Dr. Clark were sincere in their claims; that each had grounds for his position; that discussions as to the claims began contemporaneously with and continued during the negotiations with Baldwin which resulted in the execution of Exhibits A and B. It is beyond reason to say that, although Exhibits A and B dispose in detail of the respective interests of plaintiff and the Institute, those instruments were executed without plaintiff's and Clark's having considered, bargained as to, and mutually settled those very conflicting claims of which the agreement disposes.

I am of the opinion, also, that the evidence indisputably shows that the parties intended Exhibits A and B, executed only after much discussion and negotiation, to be the final written memorials of their understandings. Section 1625 of the Civil Code provides, ''The execution of a contract in writ-

ing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'' The asserted fraudulent promises of Clark, although they did not become part of the contract, directly concerned ''its matter''; they did not concern independent or collateral subjects. The asserted promise of permanent employment concerned a subject—employment of Simmons—which was expressly referred to in Exhibit A. The asserted promise that the royalties would be devoted solely to Impact Research conflicts with the provision, found in both Exhibit A and Exhibit B, that royalties shall be paid to the Institute ''or committees or other agencies or bodies which the California Institute of Technology may designate.'' I cannot agree with the strained point of view of the majority that, although the writings permit *payment* to anyone whom the Institute may designate, they are not inconsistent with Dr. Clark's asserted promise because the writings contain no reference to *use* of the funds.

The following discussion in *Lindeman* v. *Corvell* (1922), 59 Cal.App. 788, 791 [212 P. 47], is pertinent: ''While generally there are exceptions to all rules, the nonobservance of this particular one [the aspect of the parol evidence rule which forbids a showing by extrinsic evidence that a written memorial does not correctly represent the understanding of the parties] in certain cases has caused legal chaos, for the different construction given to it at times has resulted in great confusion and conflict in the authorities, and it would be an idle task to review in detail the various departures. There is no question that particular evidence is admissible to vary a writing when fraud is alleged. In discussing this subject, however, Wigmore, in his work on Evidence, states that the term 'fraud' must be understood in its legitimate narrow sense, and that failure knowingly to perform an extrinsic agreement not embodied in the writing cannot in strictness be legally included in the term 'fraud.' (4 Wigmore on Evidence, sec. 2439.) The rule that parol evidence is admissible where there is fraud on the part of the payee at the inception of the instrument is recognized, and the doctrine of estoppel has been applied with respect to representations of a party to prevent their operating as a fraud upon one who has been led to rely upon them. This doctrine, however, has been held to have no place for application when the statements relate to rights depending upon contracts yet to

be made, to which the person complaining is a party, as under such circumstances he has it in his power to guard in advance against any and all consequences of a subsequent change of conduct by the person with whom he is dealing, and to admit evidence of extrinsic agreements would be to open the door to all evils that the parol evidence rule was designed to prevent.''

Since the evidence shows, as a matter of law, that there was consideration for the benefits received by the Institute, and since plaintiff should not have been allowed to vary the terms of the writing by showing assertedly fraudulent promises inconsistent therewith, the judgment is without support and should be reversed and the cause remanded for a new trial.

Spence, J., concurred.

Appellants' petition for a rehearing was denied October 13, 1949. Schauer, J., and Spence, J., voted for a rehearing. Peters, J. pro tem., acting in place of Shenk, J.