[No. B124034. Second Dist., Div. Two. Mar. 9, 2000.]

FILET MENU, INC., Plaintiff, Cross-defendant and Appellant, v.
C.C.L. & G. INCORPORATED et al., Defendants, Cross-complainants and Respondents;
MICHAEL LEVINE, Cross-defendant and Appellant.

## COUNSEL

Jeffrey Isaac Ehrlich for Plaintiff, Cross-defendant and Appellant and for Cross-Defendant and Appellant.

Gray, Gieleghem & Belcher, Michael J. Belcher and J. Neil Gieleghem for Defendants, Cross-complainants and Respondents.

## OPINION

**MALLANO, J.**[*]—Filet Menu, Inc. (FMI), appeals from a judgment rendered against it, after a jury verdict, on its complaint against C.C.L. & G., Incorporated (CCLG) for breach of a contract to purchase menus, napkins and other restaurant supplies from FMI (the Contract), and against Augusto Salazar, Jr. (Salazar), on his personal guaranty of that obligation. FMI along with its principal shareholder, Michael LeVine (LeVine), also appeal from the judgment against them on CCLG and Salazar's cross-complaint alleging fraud and other wrongful conduct. FMI and LeVine make two arguments on appeal. First, they contend that the trial court erred in determining that the Contract was not divisible. Second, they argue that the trial court's finding that LeVine was the alter ego of FMI was not supported by substantial evidence. We conclude that regardless of whether the Contract was divisible, FMI may not enforce any part of it. We also conclude that since the jury found LeVine to be a perpetrator of the alleged wrongdoing, the judgment was properly rendered against him, whether or not he was FMI's alter ego. We therefore affirm the judgment.

### PROCEDURAL BACKGROUND

FMI's second amended complaint against CCLG and Salazar (collectively cross-complainants), on which this matter proceeded to trial, asserted causes of action for breach of contract for the purchase of restaurant supplies

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

(variously referred to in the complaint as the "Credit Application and Agreement" and " 'Purchase Order' Agreements" and the "contract"), breach by Salazar of his personal guarantee of the transaction, and various common counts.

Cross-complainants filed a cross-complaint against FMI and LeVine[1] alleging causes of action for fraud, intentional and negligent misrepresentation, concealment, breach of contract and unfair business practices against both FMI and LeVine, and identifying LeVine individually as one of the perpetrators of the alleged misconduct. All causes of action were premised on misrepresentations made in connection with the Contract. The cross-complaint also alleged that LeVine was FMI's alter ego.

The matter proceeded to trial on November 14, 1997, resulting in judgment on the jury's special verdict in favor of cross-complainants on their unfair business practices cause of action against both FMI and LeVine, in the amount of $34,749, reflecting FMI and LeVine's profits from their unfair business practices, plus interest and an unspecified amount of attorney fees and costs. The judgment was entered on April 2, 1998, with notice of entry served on April 8, 1998. On May 19, 1998, an "Amended Judgment on Special Verdict" was filed, adding $300,000 of attorney fees and costs and the date from which interest was to be calculated to the original judgment. Notice of entry of the amended judgment was filed and served on May 29, 1998.

A timely notice of appeal was filed on July 14, 1998.[2]

## FACTS

The evidence presented at trial was as follows:

FMI was in the printing and design business catering to the food service industry. CCLG owned and operated two restaurants of a five-restaurant chain of Mexican restaurants, the other three of which were owned by Salazar, an officer of CCLG. In the middle of 1992, FMI's salesman, Michael Klein (Klein), made a sales solicitation call on Salazar.

FMI conducted its business through the use of various form documents. The first, which was described by Klein as the "most important document,"

---

[1] Also named as a cross-defendant was James W. Clearly, against whom no judgment was rendered and who is not a party to this appeal.

[2] This court determined the timeliness of this appeal on December 1, 1999, when we denied cross-complainants' motion to dismiss the appeal as untimely.

was the "Credit Application and Agreement Form" (Application). The upper portion included blank lines for basic information about the customer, such as its name, address, business type, principals and bank and trade references. The bottom portion of the form included various preprinted terms. It provided that the "terms and conditions stated below shall be incorporated by reference into every Deposit/Retainer Agreement and Purchase Order . . . ." and that all "intangibles," which included creativity, concept, design, artwork, logos, slogans and the like, were owned by FMI. The form also included liquidated damages provisions: one was invoked if FMI's ownership of the intangibles was infringed by the customer, assessing damages of $35,000, and the other if the customer canceled the order after approving the design, assessing damages of $25,000.[3] The form recited that it was the agreement and contained a personal guarantee by the person signing it. Salazar signed an Application on CCLG's behalf.

The second form document utilized by FMI was a "Deposit Retainer Agreement and Purchase Order" (Retainer Agreement). It recited that it was a purchase order for the creative design, artwork and printing of the item handwritten at the bottom of the form, and required payment of a $500 nonrefundable deposit/retainer "which is not transferable to any other project" but which was to be credited against, and deducted from, the total cost of the completed order. If the order was canceled at any time after signed acceptance of the approved design, the customer was responsible for all lost profits and reasonable expenses of FMI. The Retainer Agreement stated that "[t]he total price of the completed order has not been established and will be dependent upon the design, materials, quantity, etc." It incorporated by reference the terms of the Application. Thus, deposits were being made for items of unknown price, to be fixed at a later date by FMI. Salazar signed separate Retainer Agreements for menus, place mats, dinner napkins, logo identification, cocktail napkins and matches.

Once a customer approved a design and wanted to proceed, it would sign a "Design Approval & Acceptance" (Approval) which identified the item that was approved. The Approval approved the design (except for minor alterations) and authorized FMI to proceed with the finishing work "pursuant to the terms and conditions of the [Retainer Agreement] and Purchase Order regarding this item." Upon signing the Approval, the customer was obligated to pay an additional $1,000 or 50 percent of the estimated price. Salazar signed numerous Approvals.

Finally, when the product which had been designed was to be ordered, a purchase order (P.O.) specifying the quantity of the item, its unit price and

---

[3]These liquidated damages provisions were determined by the trial court in a motion in limine to be an unenforceable penalty, which determination is not challenged on this appeal.

delivery terms was to be executed. The P.O. provided that once signed, the order could not be canceled. The P.O. was expressly made subject to the terms and conditions contained in the Application, Retainer Agreement and Approval. In February 1993, Salazar signed four P.O.s, one to purchase 4,000 menus at $4 each, one to purchase 5,000,000 place mats at $0.39 each, one to purchase 5,000,000 dinner napkins at $0.39 each and one to purchase 5,000,000 cocktail napkins at $0.09 each, the latter three items to be delivered 250,000 at a time, every 90 days.

The facts presented to the jury revealed an elaborate, fraudulent scheme perpetrated on cross-complainants. Klein testified that he handled the CCLG account while he was with FMI. He admitted that when he dealt with cross-complainants, his "intent was to defraud them purposely." He acknowledged making numerous misrepresentations to Salazar and his sister Gabriela. When he first solicited them in August of 1992, he represented to them, "per Mr. LeVine's instructions on how to sell, that we were able to go into a restaurant and design a menu for them and accompanying products that would guarantee the increase to the bottom line, their percentage of the bottom line. [¶] Q. Do you use the term 'guarantee an increase'? [¶] A. Yes, sir. [¶] Q. Did you make any representations as to what that increase should be? [¶] A. Yes, sir. [¶] Q. And what was your—or what were your representations? [¶] A. Between 20 and 40 percent." Klein told the Salazars that he could sell them colored napkins for "a little bit more" than the white napkins they were using, though he knew he could not. As per instructions from LeVine, Klein told Salazar and Salazar's sister that the Application, was "a mere credit application and nothing more," needed to check references, though Klein had been told that it was more than a credit application. It was a credit application and a purchase order designed to bind the customer to terms in the ultimate transaction. The purpose of getting the customer to sign the Application was to "hook them" into the transaction. Klein was instructed by LeVine never to leave a copy of this document with the customer. Klein was also instructed by LeVine to make certain that there were distractions when the Application was being signed so that the customers "don't really understand what they're signing and know what they're signing." Salazar was induced to sign the Application. With respect to the purchase of menus, Salazar said that he did not want to spend more than $4 per menu and wanted to purchase no more than 3,000 menus. LeVine told Salazar at a meeting that he could work within that budget knowing that the menus would cost $7 to $8.88, at a minimum, but failing to disclose that to Salazar. CCLG signed a Retainer Agreement for the menus and one for place mats at the first meeting with Klein, later signing additional Retainer Agreements for other products. There were numerous other misrepresentations and sharp *practices* employed by FMI and LeVine during the course of the transaction, elaborated upon in the trial testimony.

The jury returned a special verdict, which found that the Contract for FMI to supply menus, place mats, dinner napkins and cocktail napkins was entered with CCLG but that CCLG's consent was induced by fraudulent misrepresentations by FMI. With respect to cross-complainants' cross-complaint, the special verdict found that both FMI and LeVine fraudulently misrepresented to cross-complainants material facts, that cross-complainants relied on these misrepresentations, and that both FMI and LeVine fraudulently concealed or suppressed material facts. The jury also found that FMI and LeVine's misconduct was engaged in with the intent to defraud cross-complainants. Though the jury concluded that no damages resulted from the fraudulent concealment and misrepresentations, it did find that both FMI and LeVine engaged in unfair business practices prohibited by law and that they profited from that wrongful conduct in the amount of $34,749.

After the jury returned its verdict, the trial judge decided the alter ego claim asserted by cross-complainants, ruling that LeVine was FMI's alter ego.

DISCUSSION

FMI and LeVine raise two issues on this appeal; whether the Contract between FMI and CCLG was an "entire" or a "divisible" agreement and whether the evidence supported the trial court's ruling that LeVine was FMI's alter ego.

*The "Entire" Versus "Divisible" Contract Argument*

FMI and LeVine concede, as they must, that the jury's findings that they fraudulently made false statements to, and concealed material information from, cross-complainants was supported by sufficient evidence. However, they argue that the Contract was divisible, because it provided for delivery of different things (menus, napkins and place mats), at different times, with the consideration apportioned. Thus, they contend that, "fraud pertaining to one part of the contract does not void the entire contract; untainted portions remain enforceable." Only if FMI required that all of the items be sold as a package would the Contract be indivisible. Since there was a factual dispute on that issue, so the argument goes, it should have been submitted to the jury. Instead, the trial court, at least implicitly, determined the issue by giving the jury a special verdict form, which referred to only one contract, precluding it from determining if the Contract was divisible and, if so, which parts were enforceable.

We conclude that even if the Contract was divisible, the trial court properly refused to submit to the jury for determination, which of the P.O.'s, were fraudulently induced, so as to allow enforcement of those that were not.

■ A "divisible" contract is one "under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor . . . ." (6 Williston on Contracts (3d ed. 1962) § 860, p. 252 (Williston); see also *World Sav. & Loan Assn. v. Kurtz Co.* (1960) 183 Cal.App.2d 319, 327 [6 Cal.Rptr. 665] ["It [a contact] is severable if it is in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other nor intended by the parties to be so."].) It is one in which two or more separate partial performances on each side are agreed to be exchanged for partial performances on the other side. The failure to perform one part does not bar recovery for performance of another. (See *Agnifili v. Lagna* (1928) 204 Cal. 262, 267 [267 P. 705]; *Lowy v. United Pacific Ins. Co.* (1967) 67 Cal.2d 87, 91-92 [60 Cal.Rptr. 225, 429 P.2d 577].) The "performance of each division of the service will be impliedly a condition precedent to the recovery of a corresponding portion of the price." (6 Williston, *supra*, § 864, p. 284, fn. omitted.)

■ Once a contract is determined to be divisible, various consequences ensue. "If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, *a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.*" (Rest.2d Contracts, § 240, italics added.) Comment a to section 240, states: "This Section embodies another mitigating doctrine which reduces the risk of forfeiture in that important class of cases in which it is proper to regard corresponding parts of the performances of each party as agreed equivalents. Its effect is to give a party who has performed one of these parts the right to its agreed equivalent just as if the parties had made a separate contract with regard to that pair of corresponding parts." (Rest.2d Contracts, § 240, com. a, pp. 229-230.) Thus, if a party has breached one part of a divisible contract, he or she is not precluded from obtaining the consideration that was allocated to that portion of the contract that he or she performed. (See *Lowy v. United Pacific Ins. Co.*, *supra*, 67 Cal.2d at p. 92.)

However, a divisible contract is still only one contract. (Rest.2d Contracts, § 240, com. b, p. 230.) "[T]he pairs of corresponding parts [in a divisible contract] are not treated as if they were separate contracts. If there are two separate contracts, one party's performance under the first and the other party's performance under the second are not to be exchanged under a single

exchange of promises, and even a total failure of performance by one party as to the first has no necessary effect on the other party's duty to perform the second. . . . This is not so, however, if there is a single contract under which the parties are to exchange performances, even though it is proper to regard pairs of corresponding parts of those performances as agreed equivalents. *If there is an uncured material failure by either party, he can claim compensation for any parts that he has already performed, but he cannot enforce the contract with respect to any other pair of corresponding parts, including the part or parts that he has failed to perform.*" (*Ibid.*, italics added.)

Williston discusses the rights of an aggrieved party where a divisible contract has been breached. He states: "How far does defective performance of one or more instalments justify the injured party in refusing to continue the contract as to further instalments? If the separate instalments of the contract were properly to be considered as so many separate contracts, the answer would be clear, for a breach of one contract does not permit the party aggrieved to refuse to perform another, unless one contract is expressly conditional on performance of the other or the terms of one adopted into the other. But as has already been seen, there is but one contract in the case under consideration. [¶] Accordingly, the general rule governing bilateral contracts must be applied. If either buyer or seller, therefore, has committed a material breach of contract, or has by repudiation manifested an intention to commit such a breach, the other party should be excused from the obligation to perform further." (6 Williston, *supra*, § 864, pp. 289-290, fns. omitted.)

The foregoing highlights several principles germane to resolving the issue under consideration here. First, a divisible contract is still one contract, subject to the same governing rules as applicable to indivisible contracts, with the exception that to avoid forfeitures, the concept of divisibility permits a breaching party to recover the consideration allocated to the portions of the divisible contract which he or she has performed. Second, a party breaching a divisible contract cannot enforce any portions which he has not performed. Third, if a party has materially breached any portion of a divisible contract, the aggrieved party is excused from further performance of all uncompleted portions of the contract.

Since a divisible contract is still only a single contract, the customary rules regarding contract formation are applicable. Those rules provide that a contract induced by fraud renders the entire agreement voidable, permitting the aggrieved party to defend a suit on the contract by objecting to its enforcement because procured or induced by fraud. (*California Credit*

*etc. Corp. v. Goodin* (1926) 76 Cal.App. 785, 792 [246 P. 121]; *Friedberg v. Weissbuch* (1955) 135 Cal.App.2d 750, 756 [287 P.2d 785].) Since the jury here found that the Contract was induced by misrepresentations made with the intent to defraud cross-complainants, the Contract, whether divisible or not, was voidable. FMI's action to collect on it could thus be defended on the ground that the Contract had been procured by fraud. In so defending, CCLG and Salazar had two options, either seek to rescind the Contract or to affirm it. If affirmed, they could either sue for damages or set up the fraud as a defense and seek to offset their damages against any amounts recovered by FMS in its action on its complaint. (*McCauley v. Dennis* (1963) 220 Cal.App.2d 627, 632 [34 Cal.Rptr. 90].) Here, the record does not reflect an express election of remedies by CCLG and Salazar. Inasmuch as FMI and LeVine have not raised any issue with regard to an election of remedies, we need not discuss the matter.

Any other conclusion would be anomalous since even a party simply breaching a divisible portion of a contract could not enforce its unperformed portions that he or she did not breach. (Rest.2d Contracts, § 240, com. b, p. 230.) Similarly, a party who has defrauded another into entering a portion of a divisible contract can not enforce the other parts not so induced. We have found no authority, and none has been cited to us, permitting a defrauder to enforce the balance of a divisible contract not induced by fraud.

FMI and LeVine cite numerous cases to support their contention that FMI's agreement with CCLG was divisible (which contention we assume, for the sake of discussion, to be correct). However, they cite only one case for the proposition that a party to a divisible contract, aggrieved by the fraud of another party to such a contract, can only rescind that part of the contract which was induced by the fraud. Stated differently, they claim that a defrauding party may enforce those parts of the contract not induced by fraud. That case, *Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264 [209 P.2d 581] (*Simmons*) supports no such extravagant proposition.

In that case, Simmons, a Caltech graduate who occupied an office at Caltech and worked there for various persons on an hourly basis, invented an element used in measurement of impacts. When interest was shown by Baldwin Locomotive Works (Baldwin) in this invention, Simmons indicated to Dr. Clark, a Caltech faculty member, that he was interested in the impact research project (Impact Research) and that the income from Baldwin could be used to finance the continuation of that project. Dr. Clark and Simmons discussed the terms and conditions of a contract and provisions as to the use of the royalties, which Dr. Clark said should be paid directly to Caltech but which would be used exclusively for Impact Research.

Simmons entered two contracts. One, prepared by Baldwin's counsel and executed only by Simmons, provided that Simmons would grant no licenses of his invention without Caltech's approval and that the royalties from the invention were to be paid to Caltech, with Simmons retaining the right to have up to 40 percent paid by any licensee of his inventions to him (on specified advance notice). Dr. Clark signed this agreement as a witness to Simmons signature. The second contract, executed by Baldwin and Simmons, subject to Caltech's approval, granted to Baldwin, with specified reservations, the exclusive license to Simmons's inventions, providing a 5 percent royalty to be paid to Caltech unless Simmons requested in writing payment to him of up to 40 percent of that royalty. The agreement included a statement that Caltech approved the license.

Thereafter, Simmons learned that the royalties that Caltech was receiving were not being used for Impact Research as promised. He then served Caltech with notice of rescission and filed suit. The trial court concluded that Simmons was entitled to the royalties received by Caltech and that Caltech had no right to any past or future royalties.

The Court of Appeal stated that though the "general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions. . . . [¶] . . . [t]his rule . . . is not controlling in the case of a severable or divisible contract such as [the second contract discussed above]." (*Simmons, supra,* 34 Cal.2d at p. 275.) The court concluded that "Here there was a total rescission of the provisions relating to the Institute, and they are clearly severable from the terms and conditions applicable to Baldwin. And 'where a good cause for rescission exists as to one part of a divisible or separable contract, such portion may be rescinded in equity without disturbing the remainder.' " (*Ibid.*)

*Simmons* does not support FMI's claim that it can enforce the divisible portions of the Contract that may not have been induced by fraud. *Simmons* did not involve a defrauding party seeking to enforce a portion of a divisible contract. It involved an aggrieved party being permitted to rescind only the fraudulently induced portion of the agreement while retaining the benefit of the balance of the agreement. *Simmons* does not suggest that the wrongdoer would have that same option.

Moreover, unlike the situation presented here, *Simmons* involved the rescission by one party to a tripartite agreement of all of the portions of that agreement which pertained to one of the other parties which had made fraudulent representations, while preserving the agreement as to the non-wrongdoing third party. It did not deal with rescinding some, but not all, parts of a divisible contract against the same party.

Here, there is even greater reason to prohibit FMI, adjudicated to have defrauded CCLG, from enforcing the portions of the Contract (napkins and place mats) that it claims to have been free from fraud. FMI has asserted that those parts of the Contract were the more lucrative, while the portion dealing with menus, FMI claims, was the least lucrative. In these circumstances, to allow FMI to enforce the more favorable parts of the Contract, while excising from the Contract the least favorable, would be to allow it to benefit from its own wrongdoing, which the law does not permit. (Civ. Code, § 3517.) The victim of fraud should have the choice of whether, after having been defrauded, he or she wants to enforce the rest of the agreement. The wrongdoer is not entitled to that choice.

FMI and LeVine next argue that cases holding that the legal portions of divisible contracts that are partially *illegal* may be enforced, are, by analogy, applicable here. They cite *Pacific Wharf etc. Co. v. Dredging Co.* (1920) 184 Cal. 21 [192 P. 847], which involved a contract for the purchase of dredging equipment and for performing dredging work, and included a restriction on the plaintiff's ability to engage in the dredging business. In holding that the contract for the purchase of dredging equipment and for performing dredging work was enforceable, the court stated: "Whether a contract is entire or separable depends upon its language and subject matter, and this question is one of construction to be determined by the court according to the intention of the parties. If the contract is divisible, the first part may stand, although the latter is illegal. . . . The rule making void contracts in restraint of trade is not based upon any consideration for the party against whom the relief is sought but upon considerations of sound public policy." (*Id.* at p. 24.)

*Pacific Wharf* is not applicable here. Its ruling was premised upon the principle that illegal contracts violate public policy considerations. Thus, once the illegal portion of a divisible contract is eliminated, there, the restraint on trade, there is no interest in refusing to enforce the balance of the agreement to which the parties knowingly agreed, i.e., payment for the equipment and services rendered. A contract procured by fraud, on the other hand, implicates the private interests of the parties. There is an element of wrongdoing by one of the parties to the other, which cannot be undone by simply excising the fraudulently induced portion of the agreement. It is the private contractual interests of the parties that are being vindicated. Those interests are governed by the rules of contract which allow an aggrieved party to void the contract procured by fraud.

Additionally, the opinion in *Pacific Wharf* was founded upon a long-standing statutory provision contained in Civil Code section 1599, which provides that: "Where a contract has several distinct objects, of which one at

least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." There exists no analogous statute with respect to divisible contracts partially procured by fraud.

In any event, it appears that the underlying supposition of FMI and LeVine's divisibility argument is unsupported by the evidence. This supposition is that there are parts of the Contract, those unrelated to the menu purchase, which were not induced by FMI and LeVine's fraud and other misconduct.[4] The evidence supported the conclusion that misrepresentations and misconduct tainted the entire transaction. There was evidence of representations that the "menu . . . *and accompanying products* . . . would guarantee the increase to the bottom line, their percentage of the bottom line" by "between 20 and 40 percent." (Italics added.) It was that package of purchases from FMI which it was guaranteed would increase CCLG's profits. There was also evidence that FMI misrepresented that it could provide colored napkins at close to the price of the white napkins then being used by CCLG, when this was not possible. There were misrepresentations as to the purpose and affect of the Application, the terms of which were incorporated by reference into the purchase orders for each of the items that CCLG agreed to purchase. In short, the evidence indicated that the misrepresentations permeated the entire transaction and cannot be so neatly restricted to the menu acquisition as FMI and LeVine suppose.

We thus conclude that the trial court did not err in refusing to submit to the jury a special verdict form requiring the jury to determine whether the Contract was divisible, and if so, which portions were induced by fraud and which were not.

### The Alter Ego Argument

█ FMI and LeVine argue that there was no evidence to support the trial court's finding that LeVine was FMI's alter ego. FMI and LeVine concede that one of the two elements of alter ego, a unity of interest and ownership between the corporation and the individual, was supported by evidence. However, they dispute that there was sufficient evidence of the second element of alter ego, that injustice will result if the corporate veil is not pierced. Since FMI's conduct caused no harm to CCLG and since there was no showing that it was unable to pay the judgment, FMI and LeVine assert that their could be no injustice.

We need not decide the propriety of the trial court's alter ego ruling given the jury's verdict and the judgment. Cross-complainants' cross-complaint

---

[4]FM argues that "there was no evidence of any false statement concerning the napkins or placem[a]ts."

named LeVine individually as a defendant in each of its five causes of action, including the causes of action for fraud and unfair business practices on which the judgment was based. It alleged that LeVine and FMI committed the wrongful acts. The jury specifically found, as indicated on the special verdict form, that LeVine participated in the misrepresentations to the cross-complainants with the intent to defraud them, and in the alleged unfair business practices. It also found that he profited from those practices, specifically marking the appropriate space on the special verdict form next to LeVine's name to so indicate.

Having been found to be a perpetrator of the tortious conduct, the alter ego doctrine is unnecessary to impose liability on LeVine. He is independently responsible for his commission of the tort. ■ As stated by the Supreme Court in *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 [157 Cal.Rptr. 392, 598 P.2d 45]: "Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, but may become liable if they directly ordered, authorized or participated in the tortious conduct. [Citation.] . . . Shareholders of a corporation are not normally liable for its torts, but personal liability may attach to them through application of the 'alter ego' doctrine [citation] *or when the shareholder specifically directed or authorized the wrongful act.*" (Italics added.) The alter ego doctrine does not immunize officers, directors or shareholders of a corporation from tortious conduct that they themselves commit in the course of acting for the corporation. Anyone who participates in the commission of a tort is liable for the damages resulting from that tort. (See *McGuire v. Brightman* (1978) 79 Cal.App.3d 776, 789 [145 Cal.Rptr. 256] ["[E]veryone who takes a responsible part in the publication is liable for the defamation."].) Such liability attaches because of the person's conduct, not because they are the corporation's alter ego.

■ Since the jury's verdict here demonstrates that LeVine was found personally responsible for the tortious conduct, the judgment against him is sustainable regardless of whether he was FMI's alter ego.

### DISPOSITION

The judgment is affirmed.

Nott, Acting P. J., and Cooper, J., concurred.

On April 6, 2000, the opinion was modified to read as printed above. The petition of appellant Filet Menu, Inc., for review by the Supreme Court was denied June 2, 2000.