Filed 9/11/20  Williams v. Harden CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| J. DAVID WILLIAMS, as Trustee, etc. | |
| Plaintiff, Cross-defendant and Appellant, | G058411 |
| v. | (Super. Ct. No. 30-2016-00852444) |
| ROBERT D. HARDEN et al., | O P I N I O N |
| Defendants, Cross-complainants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed and remanded for further proceedings.

Burgee & Abramoff P.C. and John G. Burgee for Plaintiff, Cross-defendant and Appellant.

Conrad F. Joyner, Jr., for Defendants, Cross-complainants and Respondents.

## INTRODUCTION

One morning in June 2015, respondent Robert Harden (Mr. Harden) launched a dinghy into the harbor from the public boat ramp at Marina del Rey. He motored over to the *Ohana Hale,* a 72-foot yacht docked there, and got on board, pulling his dinghy up onto the yacht's back deck. He dropped through a familiar and unlocked rear hatch into a space behind the engine room, started the vessel's motor (without keys, as it turns out), untied from the dock, and motored away.

With that, the parties in this case – Mr. Harden, his wife, respondent Mary Harden (Mrs. Harden), and appellant J. David Williams (Williams)[1], trustee of the Garuda Trust – were set on a course toward ineluctable conflict. The Hardens believed they had the right to take the *Ohana Hale*, even though they had purported to sell it years before to a trust controlled by Ed and Rosemary Crowder. In the ensuing time, the Crowders had in turn purported to sell it to the Garuda Trust, which is the basis for Williams' involvement in the case. But we are forced to use the term "purported" because – through all of this – the Hardens remained on title.

Williams' checkered history ultimately cast a shadow over the purchase, as demonstrated by the judgment entered against him in the trial court. And after following legal and equitable considerations to their logical end, we conclude the shadow must extend to this appeal. We affirm the trial court's judgment against him but remand for additional relevant proceedings described below.

## FACTS

Taking the vessel[2] brought Mr. Harden's journey full circle. He and Mrs. Harden had purchased it in 2001 for $380,000. At the time they bought it, there was no

---

[1]     We address appellant as "Williams" and the Hardens as "Mr. Harden" and "Mrs. Harden" not to convey any disrespect to Williams, but simply for easy differentiation between the two respondents. We deal with Mr. and Mrs. Crowder the same way.

[2]     In its sojourn between the Hardens, the Crowders, and Williams, the *Ohana Hale* has been known by more than one name. For clarity, therefore, we refer to it simply as "the vessel."

mortgage lien on it, but Mr. Harden obtained a mortgage from Union Bank, presumably to purchase it from its previous owner. On April 29, 2003, the Hardens transferred the mortgage to Wells Fargo. The vessel's mortgage in Wells Fargo's favor (henceforth, the "Mortgage") was to secure $271,275.90 in financing to the Hardens, with the vessel as collateral. The Mortgage required the Hardens to keep the vessel in good condition, maintain satisfactory insurance, and dock it in Huntington Beach unless Wells Fargo gave written permission for it to be kept elsewhere. The Mortgage also contained the following language at paragraph 16: "I will not sell the Boat, pledge it as security for another loan, give it away, lease it or charter it without your written permission." The breach of any promise made in the Mortgage would be considered a default. From April 2001, title to the vessel was registered in the Hardens' names.

Notwithstanding the provisions of the mortgage, the Hardens decided to sell the vessel before the principal balance had been fully repaid. And though they found a buyer, the transaction itself was quite complicated – comprising at least four different documents in the span of a month.

*The Harden-Crowder Transaction*

Three of those documents related to the Harden-Crowder transaction. On or about December 23, 2010, through yacht broker Tom Yorath, the Hardens signed a form purchase agreement with the Crowders' trust, RC Trust, as buyer. The purchase price was $439,380.19. The purchase agreement, with an addendum, was executed by Mr. Harden and Mrs. Crowder. Together, the documents included the following purchase terms: RC Trust would (1) pay $50,000 down, (2) "assume ownership of the current LLC that owns" the vessel, "subject to a liability of $160,000," and (3) transfer three first lien mortgages to the Hardens with a face value of $229,380.19. In exchange, the Hardens were to deliver the vessel to the Crowders at Huntington Beach once the money had changed hands, along with title "free and clear of any and all claims, liens and encumbrances of any kind." The purchase agreement prohibited RC Trust from

3

assigning its interest under the agreement to anyone without the seller's written consent. But there was a discernible error in the sale terms: the record does not show an LLC as owner of the vessel; the Hardens remained on title as the owners.

This was only the first of the transaction's peculiarities. About three weeks later, two documents entitled "Installment Contract" were drafted. Their titles were the same, but their terms were very different, and only one was signed.

The unsigned version was dated January 14, 2011, and was between RC Trust as buyer and "Bob Harden Baker" as seller. It provided for RC Trust to purchase the vessel for the same price - $439,380.19 – but through an installment transaction by which the seller would loan RC Trust $159,411.63 toward the purchase price, due in monthly installments of $2,217.81. This monthly payment just happened to be the very same amount as the Hardens' monthly payment on the Mortgage. The unsigned version also provided Harden a "right to immediate possession" of the boat if payments were late, along with "all other remedies provided for by application of California law[.]" Harden was to ensure that title passed to RC Trust free and clear of existing liens and encumbrances, but there was no date or deadline given for the actual transfer of title. We will refer to this as the "Unsigned Installment Contract."

The signed version, dated two days later, was quite different. We shall refer to this document as the "Signed Installment Contract." It was between RC Trust, with Mrs. Crowder as trustee, and both Mr. and Mrs. Harden. Instead of agreeing to purchase the vessel itself, RC Trust agreed to "buy 100% of the Seller's Member Interest of CCSS2, LLC, a Nevada limited liability company . . . whose sole asset" was the vessel. The purchase price for the member interest in the LLC approximated the agreed-upon purchase price for the vessel in the purchase agreement, and it was to be paid in similar fashion – a down payment of $50,000 and the transfer of three first lien mortgages, with the remainder to be paid in installments. The agreement explicitly referenced the Mortgage, stating that payments on the installment loan would be directed

4

to Wells Fargo.[3]  The Hardens agreed to transfer the member interest in the LLC to the RC Trust once the installment loan was paid in full.  The Signed Installment Contract did not provide the Hardens an immediate right to possession if payments were not made, but like the Unsigned Installment Contract, it allowed them "all other remedies provided for by application of California Law."

On January 18, 2011, Mrs. Crowder, as trustee, signed a promissory note (the Note) on behalf of RC Trust in the Hardens' favor for $159,411.63.  The Note stated that it was "being executed concurrently with an Installment Agreement regarding [RC Trust's] acquisition of [the Hardens'] Member Interest of CCSS2, LLC, a Nevada limited liability company."  This would seem to refer to the Signed Installment Contract.  Once again, however, a fundamental problem was that the Hardens always held title to the vessel, not an LLC.

The record discloses no evidence the Hardens notified Wells Fargo – or even *thought* to notify Wells Fargo – that the vessel was being sold, despite the requirement in the Mortgage that they obtain the bank's consent.

*The Crowder-Williams Transaction*

The Crowders kept current with their payments to the Hardens.  But in or around June 2012, the Crowders decided that they too were through with the vessel and put it up for sale.  Using Yorath as a broker, Mrs. Crowder (as trustee of the RC Trust) signed a form purchase agreement on June 13, 2012, with The Garuda Trust as buyer.[4]  The purchase price was $380,000.  $150,000 was due at closing, and the Garuda Trust agreed to assume the existing balance on the Note of $140,000, with the RC Trust carrying the remaining $90,000 for the Garuda Trust for 12 months at no interest.  The Garuda Trust had to make minimum monthly principal payments of $1000.  Williams

---

[3]  The agreement refers to an "Attachment 'B'" which supposedly provides further detail about the Mortgage, but we see no evidence of such an attachment in the record.

[4]  The form agreement was similar to the one used in the Harden-Crowder transaction.

signed the purchase agreement on behalf of the Garuda Trust. This document, which we shall refer to as the "Crowder-Williams Purchase Agreement," made no mention of the Hardens or the Mortgage.

On or about July 6, 2012, Williams signed a promissory note for $97,394.20 in favor of Mrs. Crowder as trustee of the RC Trust. It required him to make 11 of the $1,000 minimum monthly principal reduction payments, and then one balloon payment of $86,394.20 in a year.

That same day, an addendum to the Crowder-Williams Purchase Agreement was drawn up and signed by Mrs. Crowder in her capacity as trustee. Williams signed it four days later, on July 10, 2012. The addendum clarified several important points for Williams. First, the Hardens held actual title to the vessel and the RC Trust's title was purportedly only equitable in nature. Second, RC Trust was still obligated to pay the Hardens so that they could make their monthly mortgage payments, and by entering the transaction, Williams was assuming RC Trust's obligation. Third, Williams would not get actual title to the vessel until the Mortgage was fully repaid.

Neither the Crowder-Williams Purchase Agreement nor its addendum provided the Hardens or the Crowders with a right of repossession.

*The Waters Get Choppy*

Williams moved the vessel to Marina del Rey shortly after getting it from the Crowders. But by early 2013, he was having trouble keeping up with his end of the bargain. Garuda Trust was in default, and the RC Trust had to make payments on the Mortgage to avoid a default on that loan. Early 2013 was also apparently the first time that the Hardens were notified that the Crowders were no longer in possession of the vessel. The news took Mr. Harden by surprise, but Mr. Crowder told him not to worry – he would still honor their agreement. Presumably, this meant Mr. Crowder was still committing to making payments required by the Harden-Crowder transaction documents.

The Garuda Trust eventually cured the default, but the Crowders, having been once bitten, were twice shy. They insisted that Williams and his wife, Nicole, secure the Garuda Trust's obligation under the promissory note by transferring the Williams' interest in a single-family residence in Louisiana to the RC Trust. During the course of the discussions as to how Williams could bring the delinquencies current, Mr. Crowder advised him: "You need to take action that results in a timely payment or Bob Harden and or RC Trust will have to repossess the boat."

Things were now complicated enough that they generated new issues like Jiffy Pop. Mr. Harden became aware in November 2014 that Williams might be in legal trouble. He was notified that Wells Fargo had received a subpoena from a law firm for records pertaining to the Mortgage. He began investigating and discovered Williams had been sued in federal court for fraud and other claims. He became concerned about "the future of the boat."

In June 2015, the mortgage payment was once again late. So on June 25, 2015, Mr. Harden sent an email to Mr. Crowder notifying him he had breached their agreement and Harden was accelerating the debt. Mr. Harden also promised to "use all other remedies provided for by application of California law including . . . the right to immediate possession of said boat per the terms" of their contract. No similar written notice was given to Williams, though Mr. Harden thought Mr. Crowder had forwarded the email to him.

At some point, Mr. Harden, Mr. Crowder, and broker Yorath got together and met to discuss what to do, at which time Mr. Crowder indicated he was "finished" with putting money into the vessel. He told Mr. Harden: "If you want to protect yourself, go get the boat."

As already detailed in the Introduction, Mr. Harden took this advice.

Williams discovered the vessel missing when he and his family came to enjoy it one weekend in late June. He immediately suspected Mr. Harden had

repossessed it, so he contacted him. Mr. Harden advised he had just paid off the entirety of the Mortgage balance, which by then had reduced to approximately $58,000. He demanded Williams repay him in order to get the vessel back, and Williams agreed to do so – just not until July or August. Mr. Harden refused to return the vessel until he was repaid. At the time of trial, the Hardens were in the process of selling the vessel. When Mr. Harden took it, he had discovered it had numerous items that required repair, and he invested significant sums in these repairs. The condition of the vessel affected its resale value.

*The Lawsuit*

On August 28, 2015, Williams filed his complaint against the Hardens, CCSS2, LLC, Yorath and his company, alleging among other things conversion and wrongful repossession. The Hardens filed a cross-complaint. It contained a claim for declaratory relief against Williams, and other claims against the Crowders and Yorath and his company. Amongst the claims against the Crowders was a breach of contract cause of action based on the Unsigned Installment Contract.

By the time of the court trial, only Williams and the Hardens remained in the case as parties. Williams' causes of action against the Hardens were for conversion, claim and delivery, quiet title, trespass to chattels, wrongful repossession, and constructive trust. The only claim remaining on the Hardens' cross-complaint was for declaratory relief against Williams.

The parties presented the trial court with a list of stipulated facts and controverted issues. One stipulated fact was that CCSS2, LLC was a Nevada limited liability company owned by the Hardens.

The court took testimony over two days in mid-January 2019. Toward the end of the trial, with Mr. Harden testifying, Williams' counsel introduced the Signed Installment Contract. Mr. Harden acknowledged his signature on the document, but said he was otherwise unfamiliar with the document's contents; indeed, he was completely

8

unaware there was another version of the contract. Upon questioning by the trial court, Mr. Harden also denied any knowledge of or involvement with CCSS2, LLC.

Because the parties had been unable to subpoena Mr. Crowder to testify, the court set a hearing to allow them more time to try to serve him. The parties soon discovered that Mr. Crowder was unable to appear for medical reasons so the court took the matter under submission.

While his lawsuit against the Hardens was pending, Williams pleaded guilty to several counts of wire fraud, identity theft, and money laundering in federal district court in New York. The charges related to a conspiracy to defraud film investors between 2002 and 2016. During his plea allocution on September 21, 2017, Williams indicated to the federal district court judge that he had misrepresented the Garuda Trust's assets in order to "secure financing in connection with transactions relating to a boat and a residential property." He admitted that he had "sent or caused to be sent . . . wire transfer of funds" in furtherance of this fraud.

On April 8, 2019, the court below issued a statement of decision in the Hardens' favor. The trial court made the following relevant determinations of fact: (1) Mr. Harden was the legally titled and registered owner of the vessel encumbered by the Mortgage; (2) Mr. Harden sold it to Mr. Crowder, and Yorath structured the sale as an installment contract with title to pass upon repayment of the Mortgage in order to "avoid triggering the mortgage's due-on-sale clause"; (3) the Signed Installment Contract contained false statements as to the seller because Mr. Harden had not formed or owned CCSS2, LLC, and it had never owned the vessel; (4) the Crowders had sold the vessel to Williams without advising the Hardens; and (5) the Garuda Trust's purchase was facilitated by supplying the Crowders "with false financial credit documents" and the Garuda Trust made payments on the vessel "using money Williams admitted was obtained through criminal fraud." In short, none of the parties covered themselves in glory in these transactions.

9

On the basis of these findings, the court concluded the Hardens were the legal and equitable owners of the vessel, and neither the Crowders nor Williams had any legal or equitable interest in it. Furthermore, the court concluded, equitable title had not vested in RC Trust because neither the Unsigned nor the Signed Installment Contracts were valid. Even if the Crowders had obtained equitable title from the Hardens, they had no right to transfer it to the Garuda Trust and in any event, the Garuda Trust was not entitled to equitable title because Williams had not done equity – he had obtained the vessel, and paid for it, through fraudulent or criminal activity.

## ANALYSIS

Williams'[5] opening brief on appeal sets out two basic quarrels with the trial court's ruling. First, he believes the trial court was incorrect when it found he did not have equitable title in the vessel and was not entitled to same because he had unclean hands. Second, he argues the Hardens had no right to repossess the vessel, and even if they did, they did not follow required protocols for doing so. In the reply brief, Williams also raises a new argument – he should be considered an involuntary trustee of the vessel on behalf of the victims of his fraud.

## I.     Standard of Review

A judgment after court trial is generally reviewed under a substantial evidence standard with respect to the trial court's factual findings, but conclusions of law are subject to independent review. (See *Le v. Pham* (2010) 180 Cal.App.4th 1201, 1205.) This case, however, also presents mixed fact and law questions. "'There are three steps involved in deciding a mixed fact/law question. The first step is the establishment of basic, primary or historical facts. The second is the selection of the applicable law. The third is the application of law to the facts. All three trial court determinations are subject to appellate review. Questions of fact are reviewed by giving deference to the trial

---

[5]     In referencing Williams henceforth, we refer to him in his capacity as trustee of the Garuda Trust.

10

court's decision. Questions of law are reviewed under a nondeferential standard, affording plenary review.'" (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800, quoting *People v. Louis* (1986) 42 Cal.3d 969, 985.) We are especially mindful here of the need to apply the correct standard based on the question being resolved.

## II.    The Legal Effect of the Harden-Crowder Transaction

Williams' right to relief hinges not just on the existence of an enforceable interest in the vessel. He must also have had one that prevailed against the Hardens' interest at the time Mr. Harden took the vessel. This represents rather an uphill climb for Williams. The Hardens were at all times relevant the registered and legal title holders of the vessel. And, as they point out, under Evidence Code section 662, they were entitled to a presumption of ownership of full beneficial title, which could "be rebutted only by clear and convincing proof." (See Evid. Code, § 662; see also *Murray v. Murray* (1994) 26 Cal.App.4th 1062, 1068 (stating that the presumption applies "when valid legal title is undisputed and the controversy involves only beneficial title.")

Nevertheless, it is reasonably apparent that the Hardens conveyed *something* to the Crowders by way of their transaction. We must endeavor to understand what that was because Williams' interest could only have been conveyed by the Crowders.

We first note the Hardens' purported installment transaction with the Crowders would not have diminished the strength of their legal title. "The owner of personal property has the right to make an agreement to sell the same and deliver possession thereof to the buyer, upon the condition that the title thereto shall, nevertheless, remain in the seller until the price agreed on has been fully paid, and the title so withheld by the owner will, until full payment, be superior to that of a subsequent mortgage or purchase of such personal property from the buyer, even if such subsequent mortgage or purchase was made without knowledge or notice of the reservation of title and paid full value for the property." (*Oakland Bank of Savings v. California Pressed*

11

*Brick Co*. (1920) 183 Cal. 295, 297.)  Legal title was never transferred to the Garuda Trust.

What about equitable title?  The trial court determined that equitable title never vested in the Crowders because neither of the installment contracts were valid. This ruling presents a mixed question of law and fact.

An important factual point is that the installment contracts were not the only contract documents between the Hardens and Crowders.  The parties also signed the purchase agreement with addendum.  It stated that the RC Trust was to receive full title upon payment of the purchase price, and it contained a "no assignment" clause prohibiting the Crowders from assigning "any right or interest" given under it without the Hardens' written consent.

The Unsigned Installment Contract was dated January 14, 2011.  The Signed Installment Contract was dated two days later.  While the parties had stipulated the Hardens owned CCSS2, LLC, Mr. Harden's testimony completely contradicted the stipulation; and in any event, there is no evidence in the record that an LLC ever owned the vessel.  To the contrary, the Hardens were on title.

We agree with the trial court that the Unsigned Installment Contract was ineffective.  "'[W]hen it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract.' [Citations.]" (*Duran v. Duran* (1983) 150 Cal.App.3d 176, 180.) Here, the two contracting parties indicated the transaction terms would be reduced to a signed writing. The Unsigned Installment Contract includes unfilled blanks for signatures.  And indeed, the Hardens and Crowders later executed the Signed Installment Contract.  Not having been executed, the Unsigned Installment Contract is without force and effect.

12

As for the Signed Installment Contract, the trial court determined it was "neither legal, valid, nor binding" based on its finding that Mr. Harden did not form or own CCSS2, LLC and the LLC never owned the vessel. Where a contract is formed around a "[b]elief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed," the parties are not bound by it; there is no contract. (See Civ. Code, § 1577; see also *Smith v. Zimbalist* (1934) 2 Cal.App.2d 324, 332-333.) The Signed Installment Contract conveyed an interest in an LLC of which Mr. Harden was unaware, and which did not own the vessel the Crowders intended to purchase. We cannot say the trial court erred in invalidating it.[6]

The trial court did not analyze the importance of the purchase agreement. But the addendum to that agreement contained the same mistake of fact as the Signed Installment Contract – it purported to memorialize the purchase not of the vessel, but of an LLC that never owned the vessel.

Based on these facts, the Crowders gained no interest in the vessel by way of the written contracts. The written contracts failed.

Yet the record indicates the Harden-Crowder transaction was ultimately effectuated by way of an implied in fact contract. (See Civ. Code, § 1621.) The Hardens and Crowders operated in accordance with an understanding that the Hardens would hold onto title just until such time as the Mortgage was repaid, and legal title would then pass to the Crowders. Both sides performed. The Crowders were current with their payments during the time that they possessed the vessel. The Hardens delivered possession of the

---

[6]     The Signed Installment Contract may have been a good candidate for reformation for mutual mistake. (See *Lemoge Electric v. County of San Mateo* (1956) 46 Cal.2d 659, 663 [purpose of reformation "is to make the written contract truly express the intention of the parties."].) However, the Crowders did not participate in the trial, and it is not clear this possibility was ever raised there.

vessel and continued paying the Mortgage with the Crowders' money. A possessory or equitable interest in the vessel *was* therefore created.[7]

The trial court appears to have considered the possibility of an implied contract. It alternatively concluded that even if the parties' conduct suggested an agreement to transfer equitable title, the Crowders had no right under said agreement to transfer their interest to a third party without consent. The terms of an implied contract "are questions for the fact finder when conflicting versions of the parties' negotiations require a determination of credibility." (*Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.* (2013) 218 Cal.App.4th 272, 283.) But "[w]hen there is no conflict in the relevant extrinsic evidence, as here, the interpretation of a contract presents a pure question of law for the appellate court." (*Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 131.) The parties signed a purchase agreement containing a no-assignment clause. In addition, when Mr. Crowder told Mr. Harden he had "sold" the vessel, Mr. Harden responded that Mr. Crowder could not sell it. The evidence in the record supports the trial court's determination Mr. Crowder had no right to transfer his interest to Williams.

This does not necessarily mean Williams obtained no interest in the vessel through his transaction with the Crowders. While the Crowders may have been answerable to the Hardens in damages for their breach, barring a defect in the transaction with Williams, what they had would have been conveyed to him. Consequently, our next task is to determine whether the Crowder-Williams transaction was valid.

---

[7] We observe that such a transaction would probably not have run afoul of registration requirements for marine vessels under Vehicle Code section 9900 et seq. Vehicle Code section 9900 provides: "[n]o transfer of the title or any interest in or to an undocumented vessel numbered under this code shall pass, and any attempted transfer shall not be effective, until the parties have" paid delinquent taxes and sent appropriate transfer of ownership paperwork to the Department of Motor Vehicles. However, an "[u]ndocumented vessel" refers to "any vessel which is not required to have and does not have a valid marine document issued by the Bureau of Customs of the United States or any federal agency successor thereto." (Veh. Code, § 9840, subd. (g).) The Hardens had a certificate of ownership for the vessel through the United States Coast Guard, which is a division of the Department of Homeland Security, the federal agency charged with customs enforcement. (See 6 U.S.C. §§ 202, 211.) In any event, this issue was not raised in the trial court to our knowledge.

14

**III.**        **The Legal Effect of the Crowder-Williams Transaction**

The Crowder-Williams contract documents were duly executed, and they make no mention of CCSS2, LLC, so the defects appearing in the Harden-Crowder contract documents were not repeated.  Nevertheless, the trial court made two key factual findings about this transaction: (1) Williams supplied false financial credit information in order to induce the Crowders to sell the vessel to him, and (2) he made mortgage payments using money he bilked from would-be film investors.  These findings are supported by substantial evidence: Williams admitted the former fact in his plea agreement in federal court, and he testified to the latter at trial.

When a contract is induced by fraud, the agreement is voidable by the aggrieved party.  (See *Filet Menu, Inc. v. C.C.L. & G., Inc.* (2000) 79 Cal.App.4th 852, 861.)  Such fraud in the inducement is to be differentiated from fraud in the execution, which precludes the formation of an enforceable contract.  "A contract is void for fraud in the execution if the promisor was deceived as to the nature of his or her act and did not know what he or she was signing or never intended to enter into a contract.  (*Rosenthal, supra*, 14 Cal.4th at p. 415.)  For example, a misrepresentation as to the character or essential terms of a proposed contract can render the promisor's assent ineffective." (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell LLP* (2013) 219 Cal.App.4th 1299, 1308.)

Williams used deception as to his financial worthiness and ability to make payments in order to get the vessel.  But the Crowders were not deceived as to the nature of their own act or of the transaction.  Therefore, the contracts were merely voidable as opposed to void *ab initio*.  The Crowders have largely remained silent through the litigation, and there is no evidence in the record the Hardens amended their cross-complaint to invalidate the transaction on such a basis.  Thus, the Crowder-Williams transaction remains intact.

15

## IV.    Unclean Hands

Even so, the trial court determined Williams could not obtain equitable title because, by defrauding the Crowders and using illegally obtained funds to make payments, he had not "done equity."  Unclean hands was among the affirmative defenses asserted by the Hardens in their answer.

"Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 (*Kendall-Jackson*), citing *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060.)  Aside from *Kendall-Jackson* itself, the parties here have made little effort to point us to analogous case law, but there is precedent for invoking the unclean hands defense against a conversion claim.  (*See Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 620.)  And we have already summarized the nature of the misconduct.   It is the third prong of the test over which the parties disagree.

"The misconduct that brings the unclean hands doctrine into play must relate directly to the transaction concerning which the complaint is made.  It must infect the cause of action involved and affect the equitable relations between the litigants." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at 984.)  While he admits to his misconduct, Williams argues it is only indirectly related to his claims in this lawsuit and had no prejudicial effect on the Hardens.  We disagree.

First, Williams obtained possession of the vessel by way of a fraudulent misrepresentation as to his financial position.  Therefore, the equitable interest he now asserts as the basis for his claims is itself the product of his admitted misconduct. Second, Williams admitted using criminal proceeds to make payments to the Hardens for the Mortgage.  As such, monies obtained from his crimes were essentially laundered into the vessel.  Because the Hardens were at all times the legal title holders of the vessel and

16

borrowers on the Mortgage, their own finances were subject to scrutiny as a result of Williams' misconduct. On top of this, Williams went into the transaction with his eyes very much open. The agreement he signed with the Crowders explicitly advised him that he did not have legal title to the vessel and that he must keep the payments current under their agreement with the Hardens. He expended sums on the vessel nonetheless, and breached his obligations at his own peril.[8] We are satisfied that the trial court properly applied the unclean hands defense in this case.

To be sure, the Hardens are not blameless. It does not escape our notice that the Harden-Crowder transaction was a violation of the Mortgage, which required the Hardens to obtain Wells Fargo's written consent for any sale. And their tactic of physically taking the vessel without notice to Williams was brazen even if legal (an issue we do not decide). The Hardens contend Mr. Crowder gave his consent to the repossession, and the trial court agreed with this. But Mr. Crowder had long before conveyed his equitable interest in the vessel to Williams – he had no right to consent to anything at that point.

Nonetheless, we are reminded that the unclean hands maxim "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." (*Precision Inst. Mfg. Co. v. Automotive M. M. Co.* (1945) 324 U.S. 806, 814.) Fitting are the words of a dying Mercutio: "A plague o' both your houses!" (Shakespeare, Romeo and Juliet, act III, scene 1, line 61.)

Regardless of the outcome, this is a case for which there may have been a prevailing party, but neither party truly prevails. Because we hold the unclean hands doctrine was correctly applied to bar recovery in this case, we need not examine whether

---

[8] As the Hardens point out, this fact is bolstered by the lack of evidence that the Garuda Trust itself paid any money towards the purchase of the vessel.

17

the Hardens had a right to repossess the vessel or whether they failed to follow proper procedures in doing so.

## V.     Disposition of the Vessel

Lastly, we exercise our discretion to address an issue raised by Williams in the reply brief. What is to become of the proceeds of his fraud which may have been invested in the vessel? Citing Civil Code section 2224 and *Church v. Bailey* (1949) 90 Cal.App.2d 501 (*Church*), Williams argues he must hold the vessel in trust for the benefit of those he defrauded. He misconstrues the law.

Civil Code section 2224 states: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Such a trust functions "as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990.) In *Church*, the plaintiffs discovered that a deceased employee had been embezzling funds from them and had used some of the funds to purchase real property. They therefore sued the decedent's wife to obtain a constructive trust on that property. (*Church, supra,* 90 Cal.App.2d at p. 502.)

Unlike the plaintiffs in *Church*, Williams was not the victim of the wrongful act here – he was the perpetrator. Vis-à-vis the victims of his fraud, he is in no different position than the Hardens, and is no more entitled to hold the vessel in trust than they are. Nevertheless, considering they may have received or benefited from the transfer of criminally obtained funds, the trial court must resolve whether the Hardens should be considered constructive trustees of any of the sale proceeds from the vessel, and if so, where those monies ought to go. In particular, the trial court should consider whether the federal prosecutors handling Williams' plea deal should be given an opportunity to weigh in on the sale of the vessel. We acknowledge that the parties and

18

the trial court had discussions on the record at trial regarding the status of the criminal proceedings and the possible government stance on the civil case. However, we presume the criminal proceedings have since advanced. We remand the case to the trial court so it can resolve the issues raised above and hold further proceedings as appropriate. In addition to the questions raised above, the trial court should also keep in mind the following questions:

(1) How much money paid by Williams in connection with the vessel came through ill-gotten gains from his fraud?

(2) Who was the recipient of these funds?

(3) How much money do the Hardens expect to receive on the sale and how much would they have to recoup on the sale in order to make themselves whole?

## DISPOSITION

The judgment in favor of the Hardens is affirmed, but the matter is remanded for further proceedings consistent with this opinion. Neither party is to recover costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

19